

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-14-00015-CV

---

MATADOR PRODUCTION COMPANY, Appellant

V.

WEATHERFORD ARTIFICIAL LIFT SYSTEMS, INC., Appellee

---

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 07-0808

---

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

O P I N I O N

Matador Production Company (Matador) is engaged in the business of drilling for and producing oil and natural gas. In 2006, Matador drilled a natural gas well designated by it as the Cindy Gas Unit No. 3, Woodlawn (Cotton Valley) Field, API No. 42-203-33549, situated in the H. Martin Survey, Abstract No. 431 of Harrison County (Cindy #3). As Cindy #3 was nearing its total depth, Matador engineers began to design a plan to stimulate the well by hydraulic fracturing (fracking)—an operation designed to loosen or break up tight hydrocarbon-bearing formations, thus causing the formations to have more permeability and to thus achieve greater oil or natural gas production. *See Geo Viking, Inc. v. Tex-Lee Operating Co.*, 817 S.W.2d 357, 359 (Tex. App.—Texarkana 1991), *writ denied*, 839 S.W.2d 797 (Tex. 1992) (per curiam).

The first step in a fracking operation involves pumping a particular kind of fluid (frac fluid) down a well at extremely high pressure by means of pressure pumps so that the fluid is forced into the tight rock formation, creating cracks in the rock that propagate along the azimuth of natural fault lines. *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 6 (Tex. 2008). Following the insertion of the frac fluid, a thick gel containing proppants (such as sand) is inserted under extreme pressure through perforations in the casing into the producing formation. *See id.*; *Geo Viking*, 817 S.W.2d at 359. The proppants lodge themselves in the cracks, propping them open against enormous subsurface pressure. *Coastal Oil*, 268 S.W.3d at 6–7. Next, a delayed release gel breaker is added to the frac fluid. In the final flush stage, another gel breaker is used to convert the thick gel into a liquid. All of the fluid is then drained, leaving only the proppants behind so that the cracks created by the pressurized elements remain

open for gas or oil to flow to the wellbore. *Id.* at 7. For each particular well, engineers design a fracking operation by "selecting the injection pressure, volumes of material injected, and type of proppant to achieve a desired result based on data regarding the porosity, permeability, and modulus (elasticity) of the rock, and the pressure and other aspects of the reservoir." *Id.*

Matador engineers hired independent contractor, Weatherford Artificial Lift Systems, Inc. (Weatherford), to carry out the designed fracking operation, even though they had never worked with Weatherford before. On February 6, 2007, Weatherford performed a hydraulic fracture treatment operation for Matador at Cindy #3 (frac job). Citing problems in the fracking operation, Matador refused to pay for the frac job, after which Weatherford (1) filed a suit on sworn account, verified by Senior Credit Manager at Weatherford, Lisa Shinsky, alleging that the principle balance due on the account was $314,034.83; (2) asserted, in the alternative, a breach of contract cause of action; and (3) sought attorney fees under both theories of recovery.

In its answer to Weatherford's lawsuit, Matador (1) filed a verified response wherein it maintained that the balance which Weatherford alleged was incorrect because it included charges for services that were not provided and that lawful offsets, payments, and credits had not been taken into account; (2) alleged that Weatherford was negligent in performing the frac job, that the frac job failed to properly stimulate the well, and that resulting damage to the well caused economic damage to Matador in the amount of $2,374,900.00; and (3) asserted causes of action for breach of contract, breach of the common-law duty to act with reasonable skill and diligence so as not to cause injury to Matador's property, and breach of the implied warranty of good and

3

workmanlike performance of services. In response to Matador's allegations, Weatherford asserted the affirmative defense of release from its contractual obligations.

Weatherford filed a motion for partial summary judgment on its sworn account cause of action, which was granted by the trial court without a hearing. After a lengthy trial on Weatherford's remaining breach of contract claim and Matador's counterclaims, a jury found (1) that Weatherford materially breached the contract governing the frac job, (2) that Weatherford's breach was excused because Matador waived compliance with the contract and released Weatherford from any liability arising from the contract, (3) that Matador breached the contract by failing to pay for the services that Weatherford had rendered, and (4) that Weatherford should be awarded $314,034.83 in actual damages and $58,000.00 in attorney fees. Prior to entry of judgment, Weatherford sought additional attorney fees for prosecuting the summary judgment on its suit on sworn account claim. In its final judgment, the trial court awarded Weatherford $314,034.83 in actual damages, $32,229.00 in attorney fees for representation in connection with its summary judgment motion, $58,000.00 in attorney fees incurred in pursuing the balance of its case to trial, along with an additional $1,000.00 in attorney fees should Matador pursue a motion for new trial, and a further $10,000.00 should Matador pursue an unsuccessful appeal.

As it argued to the trial court in a motion for new trial, Matador argues on appeal (1) that the trial court erred in granting Weatherford's motion for partial summary judgment on its sworn account claim, (2) that the trial court admitted unauthenticated and irrelevant documents at trial, (3) that the trial court erred in entering judgment for Weatherford since the jury determined that

4

Weatherford had materially breached the contract, (4) that the evidence was legally and factually insufficient (a) to support the jury's determination that Weatherford's breach was excused by waiver and release, and (b) to support the jury's award of the full amount of the invoice, (5) that the trial court erred in awarding $58,000.00 in attorney fees incurred during trial because Weatherford failed to segregate between fees incurred in connection with its claims and fees incurred in connection with defending against Matador's counter-claim, and (6) that the trial court erred in granting Weatherford's post-verdict motion for additional attorney fees.

We find that the trial court erred in granting Weatherford's motion for partial summary judgment on the sworn account claim. We also find that the trial court erroneously admitted documents that were (1) relied on by the judge in excluding evidence of Matador's economic losses and (2) relied on by the jury in entering its verdict in favor of Weatherford. Based on our disposition of these dispositive matters, we reverse the trial court's judgment and remand the matter for further proceedings consistent with our opinion.

## I.      Summary Judgment on Weatherford's Sworn Account Claim Was Improper

We review de novo the grant of a motion for summary judgment. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). "The party moving for traditional summary judgment bears the burden of showing no genuine issue of material fact exists and it is entitled to judgment as a matter of law." *Id*. (citing TEX. R. CIV. P. 166a(c)). We review the summary judgment evidence "in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id*. (citing

5

*City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 208 (Tex. 2002)).

Weatherford's motion for partial summary judgment attached, among other things, (1) an invoice for $314,034.83; (2) an unsigned "Stimulation Recommendation" (which constituted the contract between Matador and Weatherford for the frac job); (3) a Master Service Agreement (MSA) between Matador and Weatherford—through its parent company, Weatherford International, Ltd.—that was signed after the frac job took place; (4) a handwritten fax from Weatherford employee, Rick Schrader, to Matador employee, Ryan London, attempting to explain shortcomings (which we later detail) that occurred during the frac job; and (5) excerpts from the deposition of Matador petroleum engineer, Bradley Robinson, stating that Weatherford performed a frac job that stimulated the well and that there was no dispute regarding the previously agreed-upon price for the operation.

Matador's response to the motion for summary judgment argued that it was charged for a fully completed frac job as contemplated by the Stimulation Recommendation, even though Weatherford failed to provide all of the services required by that Stimulation Recommendation and the services actually provided were not conducted in a good and workmanlike manner. Specifically, Matador argued that Weatherford failed to comply with the Technical Specifications portion of the Stimulation Recommendation because (1) it called for use of 290 gallons of a delayed-release gel breaker, but a post-job inventory reflected that only ten gallons were used, (2) although under the Stimulation Recommendation Weatherford was to use 750,000 pounds of proppant, the amount used fell short by almost 100,000 pounds, and (3) although

6

under the Stimulation Recommendation Weatherford was called upon to perform eight stages during the frac operation, it did not perform the first four in time to effectively work and never began the eighth stage. Thus, Matador argued that summary judgment on the sworn account was improper because Weatherford could not prove as a matter of law that all of the charges included in the invoice were just and due.

Matador also argued that (1) because Weatherford did not complete the contract, it had the duty to show that it substantially performed under the Stimulation Recommendation to recover and (2) assuming that substantial compliance was shown, Weatherford was only entitled to receive the amount of the contract less the cost of remedying the defects in performance of that contract. In support of its response, Matador attached (1) the affidavit of Matador's petroleum engineer, Ryan London, who observed and assessed the work performed by Weatherford during the frac job, (2) the pre-frac and post-frac chemical inventory lists showing the materials actually used during the job, (3) a letter written immediately after the frac job from Weatherford's field engineer, Chris Fancher, to London attempting to explain and apologizing for the problems encountered during the frac job, (4) Weatherford's own internal job problem report, and (5) additional excerpts from Robinson's deposition in which he explained Weatherford's various shortcomings and suggested that the invoice charged sums for products and services not provided.

In order to determine whether there is a genuine issue of material fact on Weatherford's sworn account claim, we examine the history of the project, review the Stimulation Recommendation and the anticipated charges that it contained, compare Weatherford's

7

performance to the contract, and determine whether the evidence raised genuine issues of material fact as to whether the charges on the itemized invoice were just, true, and due, and whether the evidence accounted for all lawful offsets.[1]

Matador owned nearby wells in the same field and formation as Cindy #3. The other completed wells were producing more natural gas than Cindy #3, prompting Matador's decision to stimulate it by fracking. Matador's Robinson testified that Cindy #3 should produce at similar levels as nearby Cindy #2, if properly stimulated. Petroleum engineers London and Mike Earnest agreed with Robinson's prediction as to the anticipated results from a fracking operation and formulated the design for the frac job with Robinson and Weatherford. After receiving the design, Weatherford created a Stimulation Recommendation for the frac job; as stated before, this Stimulation Recommendation constituted the contract that governs this dispute.

---

[1]"Generally, pleadings are not competent evidence, even if sworn or verified." *Livingston Ford Mercury, Inc. v. Haley*, 997 S.W.2d 425, 431 (Tex. App.—Beaumont 1999, no pet). The exception to the general rule, of course, is found in a suit on sworn account. *Id*. Rule 185 of the Texas Rules of Civil Procedure (the Rule governing suits on sworn accounts) states,

> When any action or defense is founded upon an open account . . . including any claim for a liquidated money demand based upon written contract or founded on business dealings between the parties, or is for personal service rendered, or labor done or labor or materials furnished, . . . and is supported by the affidavit of the party, his agent or attorney taken before some officer authorized to administer oaths, to the effect that such claim is, within the knowledge of affiant, just and true, that it is due, and that all just and lawful offsets, payments and credits have been allowed, the same shall be taken as prima facie evidence thereof, unless the party resisting such claim shall file a written denial, under oath. . . . No particularization or description of the nature of the component parts of the account or claim is necessary unless the trial court sustains special exceptions to the pleadings.

TEX. R. CIV. P. 185. "It is settled . . . that a defendant's verified denial of the correctness of a plaintiff's sworn account in the form required by Rule 185 destroys the evidentiary effect of the itemized account attached to the petition and forces the plaintiff to put on proof of his claim." *Rizk v. Fin.. Guardian Ins. Agency, Inc.*, 584 S.W.2d 860, 862 (Tex. 1979); *see So. Mgmt. Servs., Inc. v. SM Energy Co.*, 398 S.W.3d 350, 353 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

The goal of the Stimulation Recommendation, dated February 2, 2007, was to complete sixty perforations, each measuring .38 inch into the hydrocarbon-bearing formation in Cindy #3. Because fracking is a time-sensitive procedure, the Stimulation Recommendation contained eight separate treatment stages. Each stage of the procedure was to be completed in a particular sequence of time with a total pump time of a little over three hours. Among other items listed, the Treatment Specifications contemplated use of 750,000 pounds of proppant, 40 gallons of WBK-137L delayed-release gel breaker to be used during the second "pad" stage, 250 gallons of WBK-137L delayed-release gel breaker to be used during the third through seventh "proppant" stages, 10 pounds of WBK-133 gel breaker to be used in the final "flush" stage, and 460,000 gallons of fresh water. The Stimulation Recommendation contained a detailed and itemized price estimate based on Weatherford's Price Book totaling $297,408.28 for the frac job. Robinson testified that Matador was aware of the approximate cost of the project and that the price estimate in the Stimulation Recommendation was not disputed.

Although the parties had agreed to a plan of operation, the words of the Scottish poet, Robert Burns, describe what can happen:

> The best laid schemes o' Mice an' Men,
> Gang aft agley,
> An' lea'e us nought but grief an' pain,
> For promis'd joy!

London's affidavit, detailed below, best explains the issues that arose:

> Based upon information provided by Weatherford, we designed a fracture stimulation treatment that utilized 160,000 gallons of Weatherford's "DynaFrac 35 HT" for the initial pad, followed by 250,000 gallons of Weatherford's "DynaFrac 30HT" for the five proppant stages of the fracture stimulation. The design called for 750,000 pounds of proppant to be pumped into the Cotton

9

Valley formation at the bottom of the well that Matador had drilled, and for that proppant to be transported by Weatherford's "DynaFrac30HT" frac fluid in accordance with a written treatment schedule and final specifications. The fracture stimulation treatment was scheduled for February 6, 2007. On that day, I arrived at the site of the Cindy #3 well at 7:45 a.m., as I was to supervise the treatment on behalf of Matador. Before any work was commenced, Weatherford's fluid tech for the job, Josh Pillow, and I confirmed in the presence of one another that there were sufficient quantities of each chemical component required to complete the fracture stimulation treatment in accordance with the latest specifications. Both Josh Pillow and I also confirmed that there were sufficient quantities of fresh water and proppant (sand) to complete the job.

One of the critical components of a successful fracture stimulation treatment is a chemical known as a "delayed-release breaker." The "delayed release breaker" is added to frac fluid in order to ensure that the fluid converts from a thick crosslinked chemical gel into a liquid. Specifically, the chemical inventory confirmed that Weatherford had 330 gallons of a delayed release gel breaker, named WBK-137, located on the "driver" side of Weatherford's chemical trailer. . . .

After a safety meeting, after Weatherford confirmed that it had tested its equipment, and after Weatherford had completed the first stage of the fracture stimulation treatment and determined that the well had broken (the rock had fractured) and was ready for treatment, Weatherford commenced "stage 2" of the fracture stimulation treatment on the Cindy #3 well. "Stage 2" involved pumping what is known as the "pad," consisting of Weatherford's "DynaFrac 35" fluid, into the fractured rock to open pathways for the proppant that was to be permanently installed in the fracture. After approximately one-third of the initial pad stage had been pumped down the well, one of Weatherford's chemical pumps stopped pumping. The failed chemical pump was supposed to pump "gel stablilizer"—a critical component of Weatherford's "DynaFrac" fluid. Approximately 45 minutes later, Weatherford re-started the pad stage. During the second attempt to complete the pad stage, Weatherford began to experience problems with the chemical pump used to add "cross linker"—another critical component of Weatherford's "DynaFrac" fluid. By the time Weatherford completed the initial pad stage, and after two chemical pump failures, it had pumped almost 500 more barrels of fluid into the Cindy #3 well than had been called for. This was in excess of a full (19-20,000 gallon) tank of fresh water.

Weatherford finished the pad stage after two hours (Weatherford's treatment schedule called for the pad stage to consume only one hour), and began the ensuing stages, known as the "proppant" stages of the fracture stimulation treatment. During these stages, Weatherford's "DynaFrac30" fluid was to be pumped into the fractured formation, laden with increasing quantities of proppant that was to be permanently installed in the well. The "DynaFrac 30" fluid was

10

designed to include specific quantities of the delayed release gel breaker, named WBK-137, that I mentioned above. The delayed-release gel breaker is an essential component of the fluid, in that it causes the fluid to convert from a viscous cross-linked gel that will transport proppant into the fractured rock into a fluid that will, upon withdrawal from the rock leave the proppant behind in the fractured rock. Without an adequate breaker, a fracture stimulation treatment cannot be completed successfully, because the proppant that is pumped into the fractured formation will flow back out with the cross-linked gel.

Weatherford completed the first four proppant stages of the fracture stimulation treatment, and commenced to complete the fifth proppant stage. The technical specifications for the fifth proppant stage provided to Matador by Weatherford called for Weatherford to pump 50,000 gallons of "DynaFrac 30" fluid laden with 5 pounds of proppant per gallon into the fractured rock. While Weatherford was attempting to complete the fifth proppant stage, Weatherford's pumps started sucking air, and it became necessary to prematurely stop pumping proppant and to immediately begin to flush the well. As a result, Weatherford was unable to complete the fifth and final proppant stage of the fracture stimulation treatment, and approximately 18,000 pounds of proppant and unbroken "DynaFrac 30" that Weatherford was supposed to pump into the fractured rock remained inside the well casing of the Cindy #3. An additional 60-65,000 pounds of proppant called for in the technical specifications was never pumped at all. Weatherford also did not complete the final, or "flush" stage of the fracture stimulation treatment, as it ran out of water.

After Weatherford shut down, at 4 o'clock p.m., we opened the well in an attempt to flow the proppant and frac fluid out of the well bore. I observed that the well was flowing back proppant-laden, cross-linked fluid—the gel had not broken. We continued to flow the well back for almost eight hours, before the cross-linked fluid finally broke. It was clear that Weatherford had either failed to pump the required quantity of delayed-release gel breaker into its "DynaFrac 30" frac fluid, or that the gel breaker that it did pump did not work. As a result, the fracture stimulation treatment was incomplete, and failed.

After Weatherford completed its work, Josh Pillow and I inventoried the same chemical tanks that we had inventoried before work was commenced. He and I both observed that the chemical tote that was carrying 330 gallons of WBK137 gel breaker before work commenced, still had 320 gallons of WBK 137 in it after Weatherford shut down.

. . . Chris Fancher, Weatherford's field engineer . . . apologized for the poor quality service provided on Matador's Cindy #3 well.

Robinson suspected that Weatherford's "chemical pumps and meters were not working

properly as was documented throughout the job by [Weatherford's] own people; and therefore, it

11

wasn't pumped correctly. . . .[t]hroughout the entire treatment." According to Robinson, because the proper amount of delayed-release gel breaker was not used, the gel did not break down the viscosity of the frac fluid on time. The gel, which was supposed to break "in a matter of a few minutes," did not fully break even after five or six hours. Thus, the frac fluid carried "many tens of thousands of proppant out of the wellbore" during the flowback period, resulting in "a very short, defective and low conductivity fracture." Robinson explained another problem:

> [Y]ou want the fluids to flow out of the formation so the gas can follow it and start producing. But if the fluids stay in the formation, then the gas can't flow.
>
> . . . .
>
> . . . . Some of the gel is broken, but the total amount of water that was recovered was much less than we expected. So, we do believe there's still quite a bit of gel back out in the formation.

He also added, "Apparantly the flow meters that Weatherford had on location were not properly calibrated; so, we were pumping a different amount of water than we thought. . . . [W]e ran out of water and had to shut down the job prematurely."

Fancher's letter to Matador attempted to explain the errors that occurred and apologized on Weatherford's behalf. It stated,

> After the safety meeting, everyone got into position and our lines were tested to max pressure plus 1,000 psi. There was a small leak found when the pressure reached 7,000 psi. We bled the lines down to replace an "O" ring. . . .
> After obtaining the information from our step-rate test, we determined that there were approximately 39 of 60 perforations open . . . .
> After the step-rate test, we began pumping again. We . . . began our pad state. During this stage we ran into mechanical problems with one of the chemical pumps on our Hydration Unit. This pump was pumping our WGS-160L (Gel Stabilizer) and it was a crucial part of our Fluid System. We tried to correct this problem without having to shut-down, but were unsuccessful. . . . After shutting down for approximately 45 minutes, we corrected our pump problems

and began pumping again.  Since we had been down for 45 minutes, and weren't sure how soon the fluid would break without any WGS-160L it was determined that we would re-start our pad stage.  As we were approaching the end of the pad stage, our surface cross linker (WXL-105L) pump on our Hydration Unit began to fluctuate.  We got a fluid sample from our Blender and determined that the cross link fluid was not cross linking in the time frame we needed. . . .

We continued with the stimulation based on the designed treatment specifications.  We had some minor problems with our surface cross linker (WXL-105L) continuing to fluctuate.  As the job went on, we were able to steady the rate.  As you will see on the charts, we also periodically lost rate on our WGS-160L (Gel Stabilizer) due to pump losing prime when swapping from an empty tote to new tote.

As we approached our 5.00 ppg sand laden stage, there was some concern about our amount of clean fluid remaining. . . . At 1,220 bbls into our final sand stage, we determined that we needed 391 bbls to complete the job. . . .

After we shut-down, our Fluid Technician physically strapped all water tanks. We found that the first 10 tanks from the mouth of location all had at least 20 inches of clean fluid remaining, which was approximately 660 bbls.  However, because of the way the tanks were leaning, this fluid was unrecoverable . . . .

. . . .

Weatherford Fracturing Technologies appreciates the opportunity to provide stimulation services on this well.  We would also like to apologize for all the problems we encountered during this job and any problems to your scheduling that this may have caused.  At Weatherford, we strive to have the highest quality possible on all our jobs, we are sorry that this was not the case for you.  We only hope that in the future we are able to give you the service that you require and deserve.

A job problem report produced by Weatherford listed the following issues:  (1) the "Chemical Pumps on Hydration Unit would not pump," (2) "Hose from Gel Transport to Hydration Unit gelled off, lost gel to Hydration unit," and (3) "Ran out of water to hydration unit - lost charge, could not flush."  The report also showed that Weatherford failed to pump 50,000 pounds of the required 750,000 thousand pounds of proppant.  The report stated that the

problems were caused due to "lack of experience," improper maintenance of the chemical pumps on the hydration unit, and failure to clean the gel hoses from prior jobs.

Robinson testified,

Initially, [London] told me that we only pumped 10 gallons of gel breaker based on his pre-job and post-job chemical inventories, which he performed out in the field. Several days later, we received some information from Weatherford where they claimed to have another tank of chemical on location that the breaker was pumped from. They never showed that to [London]. He physically inventoried the trailer where this other tank was supposed to be, and he didn't see it, it was never pointed out to him. Several days after the treatment, we were told, oh, it was out there and that's what we pumped the chemical from.

According to Robinson, while "the fracture treatment did partially stimulate the well and increase production[,] . . . . it was confirmed that the fracture was not as effective . . . based on the actual history of the well and the pressure buildup test . . . ." Simply put, Cindy #3 was not competing with Cindy #2 because "the effective fracture length . . . in the Cindy #3 [wa]s so short . . . ." As a result, according to Robinson, Cindy #3 was "not going to pay for itself" as it would have done had it been properly stimulated.

Weatherford's pre-job chemical inventory list, bearing Pillow's name, confirmed the product amounts mentioned in London's affidavit. The post-job chemical inventory list confirmed that while the Stimulation Recommendation called for the use of 250 gallons of WBK-137L delayed-release gel breaker and Weatherford had brought 330 gallons of it to the job, only 10 gallons of WBK-137L were actually used during the frac job. However, the invoice showed that Matador was charged for 162 gallons (not 10 gallons) of WBK-137L delayed-release gel breaker. Even though the job problem report stated that only 700,000 pounds of

14

proppant were used, the invoice showed that Matador was charged for 750,120 pounds of proppant.

Robinson stated,

I would dispute that [Weatherford] adequately performed a lot of those services or delivered some of those chemicals to us, so, . . . .

. . . .

[M]y position is that [Matador] would be willing to pay Weatherford some amount of money for bringing their equipment out there and all their people, a fair price based on a mutually-agreeable amount. You know, you [Weatherford] did perform a service as you pointed out, the well is producing something.

However, in light of all of the issues with the frac job, Matador's President, Joe Foran, decided not to pay the invoice.

On appeal, Weatherford argues that the partial summary judgment is proper because Matador knew what the job would cost, Weatherford performed the frac job and submitted a bill, and Matador refused to pay the bill. However, Weatherford does not argue that it was authorized to charge for materials that it did not actually provide to Matador. Weatherford's suit on sworn account was brought for goods and services actually rendered. "[W]here the services or material[s] furnished under a contract are defective due to the negligence or fault of the party contracting to furnish them, the other party to the contract should be allowed an off-set against the amount due under the contract, for repairing the damages caused by the defect." *Augusta Dev. Co. v. Fish Oil Well Servicing Co.*, 761 S.W.2d 538, 545 (Tex. App.—Corpus Christi 1988, no writ).

15

At a minimum, viewing the evidence in a light most favorable to Matador, we find that the summary judgment evidence created a fact issue regarding the amount of materials that were actually provided versus the amount of materials Weatherford claimed it provided and for which it charged Matador. Therefore, because there was a genuine issue of material fact as to whether the full amount of the final invoice was just, true, and due and whether it accounted for lawful offsets, we conclude that Weatherford did not establish its right to summary judgment on the sworn account claim as a matter of law. *See Mega Builders, Inc. v. Am. Door Prods., Inc.*, No. 01-12-00196-CV, 2013 WL 1136584, at *7–8 (Tex. App.—Houston [1st Dist.] Mar. 19, 2013, no pet.) (mem. op.); *Thorp v. Adair & Myers*, 809 S.W.2d 306, 307–08 (Tex. App.—Houston [14th Dist.] 1991, no writ); *Evans Advertising Agency, Inc. v. Morphew*, 525 S.W.2d 56, 58–59 (Tex. Civ. App.—Tyler 1975, no writ). We sustain Matador's first point of error.

## II.     Admission of Terms and Conditions and MSA Was Harmful Error

The price estimate page of the Stimulation Recommendation stated (in a font so very small that it is extremely difficult to read),

> Weatherford . . . will provide the requested equipment, materials or services to its customer. Such provision shall be governed by the terms and conditions of the applicable master service agreement between the parties. In the event that there is no such master service agreement, Weatherford's standard terms and conditions, a copy of which can be found at www.weatherford.com/t&c shall be applicable to the provision of such equipment, materials or service. (A paper copy of these standard terms and conditions will be provided to you upon written request.).

During Robinson's deposition, the terms and conditions which Weatherford asserts were printed out from its website, were attached to the Stimulation Recommendation for use as a deposition

16

exhibit. The terms and conditions contained the following liability-limiting provisions, among others:

> Customer will pay all of Weatherford's costs, Including attorney's fees and court costs, incurred in connection with the collection of past due amounts from Customer. (C) NO CONSEQUENTIAL DAMAGES: WEATHERFORD WILL NOT BE RESPONSIBLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, WHICH SHALL INCLUDE BUT NOT BE LIMITED TO, LOSS OF REVENUE, PROFITS OR ANTICIPATED PROFITS, LOSS OF BUSINESS OPPORTUNITY, LOSS OF PRODUCTION, DAMAGES FOR FAILURE TO MEET DEADLINES . . . ("CONSEQUENTIAL DAMAGES").

> (A) Weatherford uses its best efforts to ensure that all Service personnel furnished are competent and that Equipment is in good condition. Weatherford personnel will attempt to perform the work requested; however, because of the nature of the work to be accomplished and unpredictable conditions, such results cannot be and are not guaranteed. . . . (B) Customer will pay Weatherford for the Equipment and/or Services whether or not the desired results are achieved without any deduction or offset of any kind, irrespective of any Claims which Customer may assert or allege against Weatherford . . . , at the rates indicated in the Price Book in effect at the time of delivery . . . . All rates and/or charges for Equipment and/or Services are subject to change by Weatherford without notice and Customer will be invoiced at the rental or Service rates in effect at the beginning of the invoice period. (C) Customer agrees that all charges are due and payable within 30 days from the date of the invoice, . . . . (D) Customer agrees that any employee(s) furnished to Customer by Weatherford shall not be responsible for any final decision made on any job. Rather, Customer shall retain complete control and supervision of the well and performance or operations in and about the well. (E) WEATHERFORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, AS TO THE DESIGN, OPERATION, CONDITION OR QUALITY OF THE MATERIAL OR WORKMANSHIP OF EQUIPMENT DELIVERED TO CUSTOMER HEREUNDER, AND WEATHERFORD MAKES NO WARRANTY OF MERCHANTABILITY OR FITNESS OF THE EQUIPMENT FOR ANY PARTICULAR PURPOSE OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, IT BEING AGREED THAT ALL SUCH RISKS AS BETWEEN WEATHERFORD AND CUSTOMER ARE TO BE BORNE BY CUSTOMER, WHETHER OR NOT SUCH EQUIPMENT IS OPERATED UNDER WEATHERFORD'S SUPERVISION AND ALL SUCH EQUIPMENT IS HEREBY ACCEPTED BY CUSTOMER "AS IS."

17

CUSTOMERS DESIRING DIFFERENT STANDARDS SHOULD, AT CUSTOMER'S EXPENSE, OBTAIN AN INSPECTION OF THE EQUIPMENT PRIOR TO USE AND THE BENEFITS OF ANY AND ALL IMPLIED WARRANTIES OF WEATHERFORD ARE HEREBY WAIVED BY CUSTOMER. .

. . . .

. . . . CUSTOMER'S INDEMNITY OF WEATHERFORD GROUP: CUSTOMER WILL DEFEND, INDEMNIFY, RELEASE AND HOLD WEATHERFORD GROUP HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS BY CUSTOMER OR ANY OTHER PERSON OR ENTITY AGAINST WEATHERFORD GROUP OF EVERY KIND OR CHARACTER WHATSOEVER, WHETHER SUCH CLAIMS ARE BASED ON THEORIES OF CONTRACT LAW, TORT LAW, OR OTHERWISE, DIRECT OR INDIRECT, INCLUDING SPECIAL AND CONSEQUENTIAL DAMAGES ARISING OUT OF DELIVERY, PICK-UP, REPAIR, USE OR OPERATION OF EQUIPMENT, . . . IRRESPECTIVE OF WHETHER WEATHERFORD GROUP MAY BE ALLEGED OR PROVEN TO HAVE BEEN NEGLIGENT, (INCLUDING BUT NOT LIMITED TO ACTIVE, PASSIVE, JOINT, CONCURRENT OR COMPARATIVE) OR OTHERWISE LEGALLY LIABLE (WITH OR WITHOUT FAULT OR WHETHER STRICTLY LIABLE OR IN BREACH OF ANY WARRANTY) . . . .

. . . .

. . . . Inspection: Customer's acceptance of delivery of Equipment Indicates that Customer has inspected and found the Equipment to be suitable for its needs and in good condition. . . . Customer also has a duty to inspect the Equipment prior to use and notify Weatherford immediately of any defects.

The Stimulation Recommendation was emailed to Matador following oral discussions of the means by which the frac job was to be conducted. The email attachment contained no terms and conditions. At trial, Robinson clarified (1) that he did not recall noticing the tiny print referring Matador to Weatherford's website in the Stimulation Recommendation, (2) that the terms and conditions were not attached to the original Stimulation Recommendation, (3) and that he had never been to Weatherford's website. London testified that the terms and conditions were

18

never discussed and that he was not alerted to fine print by Weatherford because "we were focusing on the technical details of all of this."

Matador argued in pretrial hearings and at trial that the terms and conditions (1) were never adopted by the parties, (2) were not properly authenticated because Weatherford's counsel could not say whether the terms and conditions attached to Robinson's deposition were the same terms and conditions that existed in 2007, when the parties agreed upon the Stimulation Recommendation, and (3) had not been conspicuously included in the Stimulation Recommendation. Thus, Matador argues on appeal that the terms and conditions should not have been admitted at trial, and should not have been used by the jury to determine that Matador excused or released Weatherford's non-performance and waived the issue of consequential damages by agreeing to the terms and conditions. The trial court overruled Matador's objections and admitted the terms and conditions as evidence. Weatherford relied on the provisions of these terms and conditions to secure a jury finding (1) on its affirmative defense of release from the breach of contract claim raised by Matador, and (2) that Matador was precluded from recovering consequential damages.

Matador argues that the trial court abused its discretion in admitting the terms and conditions. A trial court's ruling in admitting evidence is reviewed for an abuse of discretion. *U–Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012); *Corona v. Pilgrim's Pride Corp.*, 245 S.W.3d 75, 79 (Tex. App.—Texarkana 2008, pet. denied) (citing *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527–28 (Tex. 2000)). Under an abuse of discretion standard, we cannot overrule the trial court's decision unless the trial court acted unreasonably or in an

19

arbitrary manner, without reference to guiding rules or principles. *Corona*, 245 S.W.3d at 79–80.

Whether labeled as a release, waiver, exculpatory agreement, or indemnity agreement, agreements used to exculpate a party from the consequences of its own negligence involve an extraordinary shifting of risk. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993). Thus, fair notice of the shifting risk must be given to the party assuming that shifted risk. *Id.* at 508–09. "The fair notice requirements include the express negligence doctrine and the conspicuousness requirement." *Id.* at 508 (citing *Enserch Corp. v. Parker*, 794 S.W.2d 2, 8 (Tex. 1990)); *see Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004). "The express negligence doctrine states that a party seeking indemnity from the consequences of that party's own negligence must express that intent in specific terms within the four corners of the contract." *Dresser*, 853 S.W.2d at 508. "The conspicuous requirement mandates 'that something must appear on the face of the [contract] to attract the attention of a reasonable person when he looks at it.'" *Id.* (quoting *Ling & Co. v. Trinity Sav. & Loan Ass'n*, 482 S.W.2d 841, 843 (Tex. 1972)). Compliance with fair notice requirements is a question of law for the court. *Id.* at 509. As such, we review de novo the trial court's ruling on these matters.

Just as in *Dresser*, Matador's counterclaims (including its claim that Weatherford breached the duty to act with reasonable skill and diligence) involved the provision of goods and services that resulted in damage to an oil and gas well. *See id.* at 506–07. Specifically, Matador alleged that Weatherford failed to (1) provide and maintain proper equipment, chemicals, and

20

supplies, (2) apply the proper chemicals, in the proper amount, at the proper time, (3) maintain proper records of its activities, (4) manage and monitor its operations, (5) supervise its employees, and (6) complete the fracture stimulation treatment, all of which caused injury to Cindy #3. The terms and conditions referenced above contained waiver and indemnity clauses by which Weatherford attempted to exculpate itself from any of its own future wrongdoing. In its brief, Weatherford cites *Dresser* and agrees that the waivers and disclaimers of consequential damages were required to be conspicuous unless Matador had actual knowledge of the terms and conditions. *See Glidden Co. v. CDNE, Inc.*, No. 12-09-00283-CV, 2011 WL 686286, at *8 (Tex. App.—Tyler Feb. 28, 2011, no pet.) (mem. op.).

Weatherford does not and, indeed, could not reasonably argue that the tiny print on its price estimate directing the customer to its website (assuming that the reader can actually read the print, despite its small size) for exculpatory language is conspicuous. *See Dresser*, 853 S.W.2d at 509–10 (adopting Section 1.201(10) of the Uniform Commercial Code's standard of conspicuousness). Rather, Weatherford argues that the website containing the terms and conditions—not the print which refers the reader there—is conspicuous.[2]

---

[2]Weatherford also argues that Matador, which had never done business with Weatherford prior to the frac job which is the source of the controversy in this lawsuit, *should have known* of the terms and conditions because the tiny print directing them to the website was located underneath the total estimated price for the frac job. Weatherford cites no authority to support this proposition. In the absence of compliance with the conspicuousness requirement, actual knowledge is required. *See Reyes*, 134 S.W.3d at 192. Weatherford also suggests that the terms and conditions were incorporated by reference into the Stimulation Recommendation. First, this argument does not respond to the requirements set forth by *Dresser*. Second, while unsigned documents may be incorporated into the parties' contract by reference in a signed document, the Stimulation Recommendation was not signed. *See Owen v. Hendricks*, 433 S.W.2d 164, 167 (Tex. 1968); *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.). Third, even if Weatherford argued that the Stimulation Recommendation was accepted because it was forwarded to Matador's petroleum engineers via email, it could not show that the terms were accepted by or binding on Matador because (1) the record as to whether anyone with authority to bind Matador to the liability-limiting and indemnity provisions of terms and conditions is unclear, and (2) the email stated, "This

21

We find that Weatherford's argument "puts the cart before the horse." Robinson's testimony that the terms and conditions were not attached to the Stimulation Recommendation was uncontested at trial. The price estimate page of the Stimulation Recommendation referring Matador to the terms and conditions on the website failed to indicate that substantial liability-limiting provisions were contained within the terms and conditions. Also, because the paragraph referencing terms and conditions was written on the last page of the six-page Stimulation Recommendation in what appears to be six-point, regular font at the bottom of the page, it would not "'attract the attention of a reasonable person when he looks at it.' *Id.* at 508 (quoting *Ling & Co.*, 482 S.W.2d at 843). Language may satisfy the conspicuousness requirement by appearing in larger type, contrasting colors, or otherwise calling attention to itself. *Id*. at 511 The purpose of the conspicuousness requirement is to protect the buyer from surprise and an unknowing waiver of his rights. *Littlefield v. Schaefer*, 955 S.W.2d 272, 275 (Tex. 1997). Because the language referring to the terms and conditions in the Stimulation Recommendation did not refer to any liability-limiting provisions and was not conspicuous, the liability-limiting provisions and waivers were "unenforceable as a matter of law." *Reyes*, 134 S.W.3d at 192. Thus, admission of the exculpatory terms and conditions was erroneous.[3]

communication does not reflect an intention by the sender or the sender's client or principal to conduct a transaction or make any agreement by electronic means." *See Expro Ams., LLC v. Sanguine Gas Exploration, LLC*, 351 S.W.3d 915, 922–24 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (explaining difference between well site operator's authority to accept and authority to negotiate services and sign job tickets and authority to bind company to indemnity provisions).

[3]Due to our finding that the terms and conditions were unenforceable, we need not address Matador's authentication objection. *See* TEX. R. APP. P. 47.1.

Matador also argues that the trial court erred in admitting the MSA, which was executed by the parties almost three months after the frac job in this case in a circumstance not involving this well. The MSA contained terms and conditions similar to the terms and conditions that were erroneously admitted. At trial, Matador argued that the MSA was irrelevant and that its probative value was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." TEX. R. EVID. 402, 403. Weatherford acknowledged that the MSA did not apply to the frac job at controversy in this case,[4] but sought admission of the MSA to show that Matador (which subsequently agreed to terms and conditions virtually identical to the terms and conditions urged by Weatherford in this case) had also agreed to those terms in this case. The trial court overruled Matador's objection.

On appeal, Weatherford argues that the MSA was admissible "to show the context of the contractual relationships between Matador and Weatherford in 2007." Clearly, because the MSA was executed three months after the frac job that was the subject of this lawsuit and because Matador had never worked with Weatherford before, the after-the-fact MSA (1) bore no relevance to the parties intentions or the context of their contractual relationship at the time of the frac job in controversy and (2) had no tendency to make Weatherford's arguments related to release or Matador's alleged breach during the time of the unfortunate frac job more probable. Thus, the trial court's ruling admitting the MSA into evidence was error.

We reverse only when the trial court's error in admitting or excluding evidence probably resulted in an improper judgment. *See Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144

---

[4]Weatherford had previously referred to the MSA as a "red herring."

23

(Tex. 2004). "Reversible error does not usually occur in connection with rulings on admission or exclusion of evidence unless the complaining party can demonstrate that the whole case turns on the excluded or admitted evidence." *Riggs v. Sentry In*s., 821 S.W.2d 701, 708–09 (Tex. App.—Houston [14th Dist.] 1991, writ denied). Matador argues that the trial court's error resulted in an improper judgment because, (1) absent the terms and conditions and the MSA, there remains no evidence to support the jury's finding that Weatherford's material breach was excused by its agreement with Matador, and (2) the trial court excluded Robinson's evidence of economic loss based on the waiver of consequential damages. We agree.

After reviewing the reporter's record of the trial, we conclude that the only evidence of excuse or release came from reference to the terms and conditions and the MSA. Also, the trial court excluded evidence of Matador's lost profits based on an erroneous ruling that Matador had waived consequential damages via the unenforceable terms and conditions.[5] During closing argument, while emphasizing the sophistication of the parties, Weatherford argued that its terms and conditions applied to the frac job in controversy in this case. With respect to the MSA, Weatherford argued,

> They signed it on May 3rd, about three months after this job, which has all the same release language.

---

[5]The original deadline for Matador to designate expert witnesses and file expert reports was February 21, 2011. Because Matador failed to timely supplement its discovery responses, Weatherford filed a motion to exclude evidence of economic damages not previously disclosed. On October 5, 2011, the trial court entered an order "freezing discovery." On October 11, 2011, the trial court granted Weatherford's motion, ruling that "[Matador] may not introduce in evidence the material or information that was not timely disclosed with regards to the amount and any method of calculating [Matador's] economic damages." However, on December 2, 2011, the trial court rescinded its order freezing discovery and set a new deadline of June 15, 2012, for designation of Matador's expert witnesses. Thereafter, it appears that Robinson was properly designated as the expert on economic damages, and the trial court denied Weatherford's motion to exclude Robinson's expert testimony.

24

You can't sue us. They didn't write in there or except out -- except for the Cindy No. 3, because they know this is the industry, okay?

They have greater sophistication, the supervision. We're out there to do a job. They know problems do occur.

Weatherford continued,

Matador is capable of defending themselves, capable of understanding the terms and conditions of the industry that have been around long before the Cindy No. 3 was drilled.

These terms and conditions, I invite you to look at them and see what they say and see the similarity in the language between what it says in our terms and conditions and what it ultimately said in the master service agreement that they signed in May, three months after this.

I mean, if the terms and conditions are unacceptable beforehand, why are they acceptable for the three frac jobs afterwards?

Because they know anybody who they hire . . . any other frac company, they're going to be signing the same piece of paper with the same terms and conditions. That's a red herring, okay?

But it was important to us because we think that it's essentially -- you know, if they wanted to carve out something unique in the industry, they would have to do it with a document, with a legal department, with something.

They couldn't just sign the master service agreement going forward having the terms and conditions in place before and act like: Hey, those don't apply to us. That's all we -- that's the only reason I point that out.

During deliberations, the jury asked to see "the original contract." When asked by the trial court to clarify which exhibit it wished to see, the jury replied, "We would like to review the master (standard) service agreement that was signed by Matador and the contract." As admitted, the Stimulation Recommendation included the terms and conditions. It appears that the jury compared the terms and conditions with the language of the MSA, just as it was expressly

25

invited to do by Weatherford. Thus, the jury found (1) that Weatherford's failure to comply with the Stimulation Recommendation was excused because compliance was waived by Matador and (2) that Matador released Weatherford from liability. However, in the absence of the terms and conditions and the MSA, there was no evidence to sustain the jury's findings on excuse or release.[6]

Moreover, the jury found that based on evidence presented throughout the trial, Weatherford materially breached the Stimulation Recommendation.[7] A material breach by one party to a contract can excuse the other party from any obligation to perform. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."). Yet, because the jury was informed by Weatherford that "the [trial] Court has already entered an order that we're entitled to be paid $314,000," it awarded Weatherford damages in the full amount of the invoice.[8] It appears—and we believe—that this finding was the result of the jury's consideration of the improperly admitted terms and conditions and MSA, as well as its knowledge of the improperly granted partial summary judgment.

---

[6]Matador has challenged the jury's findings on excuse and release for factual sufficiency. In a factual sufficiency review, we consider and weigh all the evidence and will set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). In the absence of the terms and conditions and the MSA, the evidence was factually insufficient to sustain the jury's findings on release and excuse. However, because this issue was not fully examined prior to the pretrial hearings, we will not foreclose Weatherford the opportunity to present evidence that might bear on this issue during further proceedings.

[7]This jury finding has not been challenged on appeal and will not be disturbed.

[8]Matador also challenges the jury's award of the full amount of the invoice and the award of attorney fees for factual sufficiency. Due to our resolution of the summary judgment and evidentiary issues, we set these findings aside.

Based on the record before us, we find that the trial court's error in admitting the terms and conditions and the MSA probably resulted in an improper judgment. Thus, we sustain Matador's second point of error.

## III.    Conclusion

Our finding that the trial court erred in granting summary judgment on the sworn account claim and in admitting the terms and conditions and the MSA into evidence are dispositive of this appeal. Because we have decided these matters in Matador's favor, we reverse the trial court's judgment and remand the matter to the trial court for further proceedings consistent with this opinion.

Bailey C. Moseley
Justice

Date Submitted:      October 14, 2014
Date Decided:        November 18, 2014