**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0500-19

ATLANTIC FABRICATION
& COATINGS, INC.,

     Plaintiff-Appellant,

v.

ISM/MESTEK,

     Defendant-Respondent.

_____

Argued December 9, 2020 – Decided November 12, 2021

Before Judges Ostrer, Accurso and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-3727-17.

Paul Faugno argued the cause for appellant (Faugno & Associates, LLC, attorneys; Paul Faugno, on the brief).

Matthew J. Tharney argued the cause for respondent Mestek Machinery, Inc., (Sattiraju & Tharney, LLP, attorneys; Matthew J. Tharney, of counsel and on the brief; Steven B. Gladis, on the brief).

The opinion of the court was delivered by

OSTRER, P.J.A.D.

In this commercial contract dispute, we consider whether an equipment seller's written contract successfully incorporated by reference terms that were available only on the seller's website. The incorporated terms barred claims against the seller for consequential damages if the seller breached. Based on that provision, the trial court granted the seller partial summary judgment and dismissed a buyer's claim for damages it incurred after the equipment malfunctioned. The court later denied the buyer's motion for reconsideration and granted summary judgment dismissing the complaint.

We hold that to enforce incorporated-by-reference online terms, the foundational agreement must clearly and conspicuously state that additional online terms supplement it; the agreement must provide clear directions for locating those online terms, so they may be identified without doubt; and the party to be bound must assent. As the seller here did not satisfy those requirements, we reverse.

I.

Extending all favorable inferences to plaintiff Atlantic Fabrication & Coatings, Inc. ("Atlantic") as the non-moving party, <u>Brill v. Guardian Life Ins.</u>

A-0500-19

Co. of Am., 142 N.J. 520, 540 (1995), we discern the following facts from the summary judgment record, including the parties' statements of material facts and their responses, see R. 4:46-2.

Atlantic and defendant ISM/Mestek ("Mestek")[1] crossed paths because Atlantic was interested in producing piping and ducts for heating ventilation and air conditioning ("HVAC") systems, and Mestek sells equipment used in such production. Eventually, Mestek as "Seller" offered to sell to Atlantic as "Buyer" two machines — an "Oval-Max Roller 3" machine ("Oval Roller"), used "to produce round and oval shaped blanks," and a "D-Max 1.2 E Tubeformer Machine" ("Tubeformer"). The Oval Roller cost $29,990 and the Tubeformer cost $104,220. Mestek made the offer in a written "quotation" its sales manager attached to an email to Atlantic.

The written quotation referred to another document. Below a major heading, "ADDITIONAL SALES COVENANTS ('Sales Covenants')," was a sub-heading (the fourth of four) entitled "Terms and Condition of Sale"; under that sub-heading, the quotation stated, "This quotation and all sales hereunder shall be governed by the Seller's Machinery Terms and Conditions of Sale

---

[1] Mestek asserts that "Mestek Machinery, Inc." is the correctly named party. But we note that "ISM Machinery, Inc.[,] a Mestek Machinery, Inc. company" identified itself as "Seller" in an offer to sell the equipment at issue to Atlantic.

posted on the Seller's website (www.ismmachinery.com) and the Sales Covenants contained in this quotation." That was not the only reference to the "Seller's Machinery Terms and Conditions of Sale." In the first of three paragraphs under the first sub-heading, "Price and Payment Schedule," the quotation also stated, "For additional details regarding pricing and payment, please refer to Seller's Machinery Terms and Conditions of Sale." But the quotation did not refer to the website.

Although Atlantic did not sign the quotation to demonstrate its acceptance (Mestek representatives did sign), Atlantic admitted in response to Mestek's partial summary judgment motion that it accepted the offer and Mestek was paid $134,000.

But the transaction was actually more complicated than that. Although Atlantic alleged in its complaint that it "entered into a contract with [Mestek] to purchase" the two machines, Mestek actually sold the two machines to an equipment financing company, Scottrade Bank Equipment Finance ("Scottrade"), which in turn leased the machines to Atlantic with an option to buy them for $1 after sixty monthly payments. Atlantic acknowledged as

4

much in its motion for reconsideration, when it asserted that it leased the machines from Scottrade and denied signing a contract with Mestek.[2]

Atlantic alleged the Oval Roller was delivered months after the Tubeformer (though it said the two machines were designed to work together), and the Oval Roller malfunctioned. Efforts to repair it were unavailing. Although Mestek eventually replaced the Oval Roller with an operational machine, Atlantic claimed it lost numerous business opportunities in the meantime. Atlantic sold the replacement machine. Then, Atlantic sued to recover its lost profits, which an expert later estimated ranged between $212,146 and $353,577. Atlantic asserted claims of breach of contract, breach

---

[2]  Three months after sending the Oval Roller quotation, Mestek sent an invoice to Atlantic for both machines. But four days after that, Scottrade issued a purchase order that identified itself as "Buyer," Atlantic as "Customer," and Mestek as "Vendor." Notably, the purchase order's terms and conditions include Mestek's warranty that the machines were merchantable and fit for their intended purpose and an integration clause stating that the purchase order was the "complete and exclusive statement" of the parties' agreement and superseded any prior agreement. However, Mestek's responsive "order acknowledgement" stated, "This sale shall be governed by the Seller's TERMS AND CONDITIONS OF SALE posted on Seller's website (www.mestekmachinery.com)," which "superseded" any inconsistent provisions in the buyer's order forms. (Notably, the document title and URL differ from those in the quotation.) Atlantic also entered into a lease addendum authorizing Scottrade to pay for the machines before delivery and acceptance, and waiving any claim against Scottrade if the equipment was not fully operational.

of implied warranty, breach of the implied covenant of good faith and fair dealing, and fraud.

Mestek eventually invoked a limitation of liability provision in its standard "Machinery Terms and Conditions of Sale," which barred claims for consequential damages. The enforceability of that provision lies at the heart of this case.

It is undisputed that if one scrolled down to the bottom of the website accessed at www.ismmachinery.com around the time Mestek sent its quotation, one would find a link in small type for "Terms & Conditions" — but no link for "Seller's Machinery Terms and Conditions of Sale" as the quotation stated. Clicking on the "Terms & Conditions" link brought the visitor to a document entitled "Machinery Terms and Conditions of Sale" — not "Seller's Machinery Terms and Conditions of Sale." That ten-page, single-spaced document included at page eight, paragraph sixteen, the limitation on liability provision, which states:

### 16.    LIMITATION OF LIABILITY

BUYER UNDERSTANDS AND ACKNOWLEDGES THAT SELLER SHALL NOT BE LIABLE FOR ANY SPECIAL, DIRECT, INDIRECT, CONSEQUENTIAL, PUNITIVE OR INCIDENTAL DAMAGES OF ANY KIND, OR LABOR, EXPENSES, LOST PROFITS LOST

A-0500-19

OPPORTUNITIES, OR SIMILAR DAMAGES OF ANY KIND; AND REGARDLESS OF THE LEGAL THEORY OR CAUSES OF ACTION BY WHICH CLAIMS FOR ANY SUCH DAMAGES AS SET FORTH IN THE ENTIRETY OF THE ABOVE SECTION ARE ADVANCED, WHETHER OR NOT SELLER HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH DAMAGES.

Atlantic owner Ehren Steingart certified that after he noted the quotation's "reference to the website reflecting sales machine terms and conditions," he "did go to the website yet [he] was not able to locate any posted terms and conditions on the defendant's website." He said he only found the "Terms & Conditions" link after the litigation began. Steingart "assumed that all the contractual terms were all contained in the documents" that had been provided.

Mestek's counsel certified, "An archived version of the ismmachinery.com website from February 9, 2014 is available via the Internet Archive, at https://web.archive.org/web/2014020941517/http://www.ismmachinery.com."[3] He added, "A true and correct copy of that archived

---

[3] "The Internet Archive is a nonprofit online digital library" that offers "access to past internet websites," by "using automated software programs known as crawlers, which surf the Web and intermittently store copies of internet files, which are then preserved in the archive." Bacon v. Avis Budget Grp., Inc., 357 F. Supp. 3d 401, 431 n.23 (D.N.J. 2018). Notably, the archived website predates the one referenced in the quotation by several months. Mestek sent

7

website is attached . . . ." In that copy, below Mestek's various product offerings, a copyright notice and ISM Machinery's address and phone numbers, one could find the "Terms & Conditions" link among several other links. In relatively small type, there were links for "Home," "Contact Us," "Sitemap," "Terms of Use," "Terms & Conditions," and "Non-Machinery Terms & Conditions." Counsel certified that "[a] user clicking on the 'Terms and Conditions' link would be brought to a PDF titled 'Machinery Terms and Conditions of Sale.'"

In response, Atlantic's counsel attached a depiction of the website with the URL https://www.mestekmachinery.com/brands/ism-machinery, apparently dated January 28, 2019 (in the midst of this litigation), which includes a link for "Terms & Conditions" below a 2016 copyright notice, to the right of links for "Contact," "Great Moments," and "Facilities."

In granting Mestek partial summary judgment and dismissing Atlantic's consequential damage claims, the trial court agreed the website's heading for

the quotation in June 2014, and the deal closed with Scottrade over three months after that. Furthermore, we presume counsel is simply conveying what he found on the Internet Archive, as opposed to verifying that the archived website is in fact what was viewable at ismmachinery.com in February 2014. Cf. Pressler & Verniero, Current N.J. Court Rules, cmt. on R. 1:6-6 (2022) ("Affidavits by attorneys of facts not based on their personal knowledge but related to them by and within the primary knowledge of their clients constitute objectionable hearsay.").

"Terms & Conditions" was not conspicuous, but the quotation's reference to additional terms was. The judge found that the quotation contained a bold-type heading that referred to terms and conditions and alerted the reader "there are terms and conditions on the website." The judge also found that with one click on the "Terms and Conditions" link on the website, one would reach the terms and conditions that included the limitation on liability for consequential damages.

The judge framed the legal issue to be "whether or not the placement of the link where it was could be perceived or proven to have been placed with a goal of making a buyer disinclined to find out what he was agreeing to." The judge then found that standard did not apply "in a business transaction when notice that there are additional terms that are part of the contract is very clearly set forth in a two-page document." The judge concluded Atlantic could not "avoid the applicability of the term by the fact of where the link is on the web page to get to those terms and conditions."

Atlantic sought reconsideration. Highlighting its lease with Scottrade and noting that no one from Atlantic signed the quotation, Atlantic evidently argued that the quotation and the incorporated-by-reference online terms were

9

unenforceable under the Statute of Frauds.[4]  In denying the motion, the trial court held that Atlantic could have raised the Statute of Frauds issue in opposing Mestek's motion, and, therefore, Atlantic inappropriately raised the argument for the first time in its reconsideration motion.  The court did not reach the merits of the Statute of Frauds argument.

The court later granted Mestek's motion for summary judgment.  The court noted that its partial summary judgment order foreclosed Atlantic from recovering consequential damages; and Atlantic accepted the replacement machine and resold it.

This appeal followed.  Atlantic contends the trial court erred in enforcing the limitation-of-liability provision.  Atlantic disputes there was a meeting of the minds, noting how Mestek made it difficult to find the incorporated document.  Atlantic contends the quotation and the incorporated terms violated the Statute of Frauds and the trial court erred in denying its reconsideration motion.  Atlantic also argues summary judgment was premature because it sought discovery on Mestek's website design, and

---

[4]    Mestek has supplied us Steingart's certification supporting the reconsideration motion.  But we do not have Atlantic's supporting brief, and no oral argument was heard.  We gather Atlantic argued Statute of Frauds based on the court's subsequent written opinion denying the motion.

Atlantic contends for the first time that the quotation was a contract of adhesion.

## II.

No doubt, contracting parties may agree to bar consequential damage claims. See Kearney & Trecker Corp. v. Master Engraving Co., 107 N.J. 584, 591-92 (1987); N.J.S.A. 12A:2-719(3) (stating "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable," and adding that "limitation of damages where the loss is commercial is not" "prima facie unconscionable").

The principal issue here is, did Mestek successfully incorporate the additional terms and conditions that included that bar? Applying the same summary judgment standard as the trial court, R. 4:46-2, and owing no deference to the trial court's legal conclusions, Henry v. N.J. Dep't of Hum. Servs., 204 N.J. 320, 330 (2010), we conclude Mestek did not.

The issue is legal. The enforceability of a contract term is a legal question. Goffe v. Foulke Mgmt. Corp., 238 N.J. 191, 207 (2019). In particular, "[a]lthough it is clear that whether one agreement has incorporated another has factual components, whether material has been incorporated

11

presents a question of law." 11 Williston on Contracts § 30:25 (Lord ed. 2012).[5]

Our cases have long held that contracting parties may agree to incorporate a second document into a first, even if the parties sign only the first. See, e.g., Keller v. Homan, 136 N.J. Eq. 228, 229 (E. & A. 1945); Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 410 N.J. Super. 510, 533 (App. Div. 2009); Johnson & Miller v. Buck, 35 N.J.L. 338, 345 (Sup. Ct. 1872). We have held that there are three requisites to enforcing an incorporated-by-reference document: the main document must clearly refer to the second, incorporated document; the main document must identify the incorporated document with such precision that it may be identified without doubt; and the parties must know and assent to the incorporated document. Alpert, Goldberg, 410 N.J. Super. at 533.

---

[5] We recognize that whether parties mutually assented to contract terms may present a fact question. See Bater v. Cleaver, 114 N.J.L. 346, 351 (E. & A. 1935). But the issue here is not what the parties in fact did (or did not do) to express their assent (although it is undisputed that Atlantic did not sign the quotation). Rather, the dispositive issue is the effectiveness of Mestek's method for incorporating terms into the document Atlantic said it accepted. As we discuss, one of factors is the adequacy of the notice of the incorporation. In other contexts, we have held that presents a legal issue too. See Caspi v. Microsoft Network, 323 N.J. Super. 118, 126 (App. Div. 1999) (stating that "[t]he issue of reasonable notice regarding a forum selection clause is a question of law for the court").

A-0500-19

We so held by adopting <u>Williston</u>'s summary of the law:

> Generally, all writings which are part of the same transaction are interpreted together. One application of this principle is the situation where the parties have expressed their intention to have one document's provision read into a separate document. So long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, non-contemporaneous document, including a separate agreement to which they are not parties, and including a separate document which is unsigned. . . . And, in order to uphold the validity of terms incorporated by reference, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.
>
> [<u>Alpert, Goldberg</u>, 410 N.J. Super. at 533 (alteration in original) (quoting 4 <u>Williston on Contracts</u> § 30:25 (Lord ed. 1999)).][6]

This statement is consistent with our prior case law. <u>See</u> <u>Keller</u>, 136 N.J. Eq. at 229 (stating "[t]he determinative question is whether that [incorporated] document is sufficiently identified by the language of [the main document] . . . to be considered as expressing and including the agreement between the parties"); <u>Johnson & Miller</u>, 35 N.J.L. at 345 (stating that the main document must "so clearly or definitely refer to the writing, that by force of

---

[6] This summary of the law is virtually unchanged in the current version of <u>Williston</u>. 11 <u>Williston on Contracts</u> § 30:25 (Lord ed. 2012).

the reference the writing itself becomes part of the instrument which refers to it" (citation omitted)); see also Bacon v. Avis Budget Grp., Inc., 357 F. Supp. 3d 401, 417-19 (D.N.J. 2018) (applying Alpert, Goldberg to deny enforcement of car rental terms contained in a "rental jacket" that the rental agreement incorporated by reference).

In Alpert, Goldberg, we held that a retainer agreement did not successfully incorporate the firm's "standard billing practices and firm policies," which the firm offered to provide upon request. 410 N.J. Super. at 520, 535. We did so because the retainer agreement "did not define with sufficient specificity" the incorporated terms; "[t]he reference contained no document dates or an identifiable publication number"; and there was "no indication that the terms of the proposed incorporated document were known or assented to by [the] defendants." Id. at 535.

Similarly, in Bacon, the court found that a car rental agreement did not "describe the Rental Jackets in such a way that it [was] clear beyond doubt that they were incorporated." 357 F. Supp. 3d at 417-18. The court noted the disconnect between the title of the document — "Rental Jacket" — which the underlying rental agreement purported to incorporate, and the actual title of the document that the defendant asserted was incorporated — "Rental Terms and

14

Conditions." Id. at 418. Even within the allegedly incorporated document, the term "Rental Document Jacket" — not "Rental Jacket" — was used. Ibid.

The heightened scrutiny of incorporated documents is evidently designed to assure there is an actual meeting of the minds and to discourage sharp practices. "Incorporation by reference may be used as a tool to obtain contractual rights without expressly bargaining for them. Even if a party reads a form proffered by the other, that diligence may not extend to asking for and further reviewing something incorporated by reference." Royce de R. Barondes, Side Letters, Incorporation by Reference and Construction of Contractual Relationships Memorialized in Multiple Writings, 64 Baylor L. Rev. 651, 661 (2012). Thus, "[o]ne inclined to sharp dealing might seek to obtain surreptitiously contractual rights by incorporating by reference advantageous terms." Id. at 654.

We have found no reported New Jersey authority applying these principles to a case like this — where a hard copy of the main contract purports to incorporate a second document available only on the internet. But our courts have addressed issues that arise when contracting occurs entirely on the internet. In Wollen v. Gulf Stream Restoration & Cleaning, LLC, ___ N.J. Super. ___, ___ (App. Div. 2021) (slip op. at 2), we refused to enforce an

15

arbitration agreement in a suit by a homeowner against a contractor referral service. We held the hyperlink to "Terms & Conditions" containing arbitration provisions "did not provide reasonable notice of HomeAdvisor's terms and conditions to the reasonably prudent internet user." Id. at ___ (slip op. at 25). Furthermore, the hyperlink did not indicate "that the user was required to read the terms and conditions before submitting her request for service." Ibid. Relying on Alpert, Goldberg, we held that the required proof of knowledge and assent was absent. Id. at ___ (slip op. at 26-27); see also Hoffman v. Supplements Togo Mgmt., LLC, 419 N.J. Super. 596, 611 (App. Div. 2011) (refusing to enforce forum selection clause that was contained in a disclaimer the defendant "submerged" at the bottom of a webpage where the consumer would be unlikely to view it before completing a transaction).

By contrast, our courts have upheld contracts executed online where the party was required to affirmatively assent to the terms in one way or another. See Skuse v. Pfizer, Inc., 244 N.J. 30, 56-58, 61 (2020) (enforcing an arbitration agreement the employer delivered by email that "highlighted" the proposed agreement, "provided a conspicuous link" to it, and required the employer to click to acknowledge assent); Caspi v. Microsoft Network, 323 N.J. Super. 118, 122-24 (App. Div. 1999) (enforcing a "click-wrap" agreement

that required the consumer to click "agree" to preceding terms before proceeding to the next step in the contracting process).

Applying these principles, Mestek's incorporation by reference of its terms and conditions falls short. We acknowledge that the quotation clearly and conspicuously alerted Atlantic that additional terms governed the sale of the machines. But the quotation did not provide sufficient information to enable Atlantic to identify the incorporated terms beyond doubt.[7] As in <u>Bacon</u>, there exist discrepancies in the naming of the documents. In its quotation, Mestek identified the incorporated document as "Seller's Machinery Terms and Conditions of Sale."[8] But the only link on the website that could lead someone to the document reads "Terms & Conditions." Furthermore, the "Terms & Conditions" link was inconspicuously located at the bottom of the webpage. The letters are not bolded (unlike most other links); the font size is the smallest of any text on the page; and the link sits crammed between other links in a way that increases the likelihood it could be overlooked. Furthermore, its

---

[7] Nor did the quotation tell Atlantic what the incorporated terms covered, particularly, its exclusion of liability for consequential damages. That has particular significance under the Uniform Commercial Code (UCC) which we discuss separately below.

[8] Perhaps, Mestek intended "Seller's" to modify the title, as opposed to be a part of it. But, at best, Mestek's choice of language created ambiguity.

A-0500-19

placement might lead a reader to think it pertains to terms and conditions governing the use of the website itself.

While someone comfortable with navigating websites might have ultimately found the "Seller's Machinery Terms and Conditions of Sale" document — although titled "Machinery Terms and Conditions of Sale" — Steingart certified without dispute that he could not.  Thus, Steingart lacked knowledge of its terms and did not assent to them.

We recognize that "in the absence of fraud, one who does not choose to read a contract before signing it, cannot later relieve himself [or herself] of its burdens."  Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 386 (1960).  But that rule is not inviolate "in the framework of modern commercial life and business practices."  Ibid.  In particular, the duty to read rule makes no sense without a realistic chance to read.  See 7 Corbin on Contracts § 29.12 (Perillo ed. 2002) (explaining that under modern cases, "true assent does not exist unless there is a genuine opportunity to read the clause in question").  Practically speaking, Steingart lacked a realistic chance to read the incorporated terms and conditions.

We also recognize that Steingart could have asked Mestek's sales manager directly for a copy (although the quotation did not expressly invite

18

such a request).  But in <u>Alpert, Goldberg</u>, even an explicit statement that an incorporated document was available upon request was not enough to salvage an attempted incorporation by reference.  With less effort than Steingart would have expended to request the document, Mestek could have easily provided it in the first place, by attaching it to the same email that included the quotation.  Alternatively, Mestek could have provided a document-specific link, with an "html" or "pdf" extension that, with one click, would have taken Steingart directly to the document.  We can think of no excuse for omitting such extensions, other than to make it more difficult — and thus, less likely — that the other party would find and read the document.

Other courts have scrutinized the incorporation of online terms, with varying results.  <u>See, e.g.</u>, Kent D. Stuckey & Robert L. Ellis, <u>Internet and Online Law</u> § 1.02[4] (2021) (citing cases); Nathaniel P. Mark, <u>Caught in the Web: The Incorporation and Enforceability of Extra-Contractual Online Terms and Conditions</u>, 26 <u>S.C. Law.</u> 22, 24-27 (May 2015) (citing cases); Barondes, 64 <u>Baylor L. Rev.</u> at 657-67 (citing internet cases among others).  Synthesizing the various cases, Mark, in <u>Caught in the Web</u>, states that incorporated by reference online terms and conditions will be enforceable

> provided that 1) the writing clearly and conspicuously
> identifies the source of the online terms and conditions

so that the contracting party may review them should it so choose (e.g., www.xxxco.com/xxxcot&c.htm); 2) expressly incorporates the online terms and conditions into the body of a written document; and 3) contains attestation language stating the contracting party intends to be bound by those terms.

[26 S.C. Law. at 27.]

That rule is consistent with the one we have articulated here.[9]

Mestek misplaces reliance on two out-of-state cases:  International Star Registry of Illinois v. Omnipoint Marketing, LLC, 510 F. Supp. 2d 1015 (S.D. Fla. 2007), and One Beacon Insurance v. Crowley Marine Services, 648 F.3d 258 (5th Cir. 2011).

The court in International Star Registry enforced a choice-of-law-and-forum provision that the defendant included in its website's terms and conditions section, which the defendant's invoice incorporated by reference. 510 F. Supp. 2d at 1021.  The invoice stated:  "By my signature below, I certify that I have read and agree to the provisions set forth in this invoice and to the terms and conditions posted at http://www.omnipointmarketing.com/genterms.html,  and  that  I  am  duly

_____

[9] Notably, the author suggests that a link with a document-specific extension like "htm" is required to satisfy the rule.

20

authorized to bind the following organization ('client') to such provisions." Id. at 1019.

For two reasons, the case does not support enforcing Mestek's website terms. First, the defendant identified the incorporated document with far greater specificity than Mestek did here. Rather than direct the client to the defendant's website and require the client to navigate to the incorporated terms as Mestek did in its quotation, the defendant included a link to the specific document, "genterms.html," which enabled the client to ascertain "beyond doubt" the incorporated document. International Star Registry, 510 F. Supp. 2d at 1019; see Alpert, Goldberg, 410 N.J. Super. at 533 (citation omitted). Second, the defendant also assured the client had "knowledge of and assented to the incorporated terms," by requiring the client to certify that it read and agreed to them. International Star Registry, 510 F. Supp. 2d at 1019; Alpert, Goldberg, 410 N.J. Super. at 533 (citation omitted). By contrast, Mestek did not require such certification.

In One Beacon, the court affirmed the trial court's enforcement of website terms that a repair service order ("RSO") incorporated. 648 F.3d at 267-70. The defendant, a barge and tugboat company, issued the RSO to a barge repairer. Id. at 261, 263. It stated that it was "ISSUED IN

21

ACCORDANCE WITH THE PURCHASE ORDER TERMS & CONDITIONS ON WWW.CROWLEY.COM/DOCUMENTS & FORMS, UNLESS OTHERWISE AGREED TO IN WRITING." <u>Id.</u> at 263. To access the incorporated document, the repairer had to go to www.crowley.com, and click on the "Documents & Forms" link on the menu bar. <u>Ibid.</u> Once there, the repairer had to select "Vendor Relations" from a drop-down menu and then select "Purchase Order Terms and Conditions." <u>Ibid.</u>

One might question the ease with which the repairer could find the incorporated document once it had gone as far as the RSO has directed — that is, to the "Documents & Forms" link. But the district court found as a factual matter that the repairer's representative was "internet savvy"; he admitted he could have accessed the terms and conditions at any time; and the repairer did not contest the trial court's finding that "a reasonable person would have been able to find the terms and conditions." <u>Id.</u> at 269. No such factual findings were made here. Rather, Steingart certified without dispute that he tried but could not find the Seller's Machinery Terms and Conditions of Sale on Mestek's website.

Mestek also puts undue weight on the number of clicks needed to reach an incorporated document. True, after arriving at the marine company's

website, the repairer in <u>One Beacon</u> had to click three times to reach the incorporated document, and Atlantic had to click just once to reach Mestek's terms and conditions. But Atlantic lacked directions on what to click. The "Terms & Conditions" link was inconspicuous and did not match the title of the document the quotation referenced. By contrast, the marine company directed the repairer to the "Forms & Documents" section of its website. In sum, we conclude Mestek misplaces reliance on <u>International Star Registry</u> and <u>One Beacon</u>.

We address one additional reason to question the efficacy of Mestek's incorporation by reference: Mestek failed to alert Atlantic in its quotation that the incorporated terms and conditions limited its liability and excluded claims for consequential damages. That lack of conspicuousness may run afoul of the UCC's prerequisites to limiting or excluding consequential damage claims.

The UCC allows sellers to exclude or modify an implied warranty of merchantability and fitness, but if the limitation or exclusion is in writing (as it must be with an implied warranty of fitness), the exclusion or modification must be "conspicuous." N.J.S.A. 12A:2-316(2).[10] And "'[c]onspicuous,' with reference to a term, means so written, displayed or presented that a reasonable

---

[10] N.J.S.A. 12A:2-316(3) sets forth exceptions to the rule that are not relevant here.

person against which it is to operate ought to have noticed it." N.J.S.A. 12A:1-201(b)(10). "Conspicuous terms" include headings and language that are distinctive because of greater size, "contrasting type, font, or color," or, in the case of language, because it is "set off from surrounding text of the same size by symbols or other marks that call attention to the language." N.J.S.A. 12A:1-201(b)(10)(a) to (b).

Relatedly, the UCC allows sellers to limit or exclude consequential damages, so long as the limitation or exclusion is not "unconscionable." N.J.S.A. 12A:2-719(3). Other courts have imported the conspicuousness requirement of section 316 into section 719, holding that limitations of damages must be conspicuous; in other words, non-conspicuous limitations of damages are unconscionable. See Oldham's Farm Sausage Co. v. Salco, Inc., 633 S.W.2d 177, 182-83 (Mo. Ct. App. 1982) (stating that "although there is no mention of whether a limitation clause must be conspicuous, the fact that a clause is tucked away in fine print on the back side of the signature page may well lead to 'unfair surprise' and therein be unconscionable"); Adams v. Am.Cyanamid Co., 498 N.W.2d 577, 588 (Neb. Ct. App. 1992) (holding that "the requirement of § 2-316(2) that a disclaimer of warranty of merchantability be conspicuous also applies to limitations of remedies" under § 2-719); Seibel

24

v. Layne & Bowler, Inc., 641 P.2d 668, 392 (Or. Ct. App. 1982) ("To be effective, contract provisions which limit the buyer's remedies for breach must be conspicuous or brought to the buyer's attention."); Stauffer Chem. Co. v. Curry, 778 P.2d 1083, 1093 (Wyo. 1989) (holding that "the appropriate rule is that a limitation of liability statement, like a disclaimer of implied warranty, must be conspicuous in order to become a basis for the bargain").[11]

Without expressly equating lack of conspicuousness with unconscionability, we have held that a limitations of liability provision is unconscionable if it is hidden in a way likely to escape notice. Jutta's Inc. v. Fireco Equip. Co., 150 N.J. Super. 301, 307 (App. Div. 1977). In Jutta's, we held "[t]he limitation clause was concealed in a provision clearly suggesting that it was conferring upon the purchaser a benefit in the form of a guarantee; nothing in the heading [which was 'Distributor's Guarantee'] suggest[ed] the presence of a sharp limitation on defendant's overall liability hidden therein." Ibid. Contributing to the unconscionability finding, we noted the clause's meaning was obscure, and even the limited liability for damages equal to price paid was contingent upon entering a maintenance contract. Ibid.; see also 4B Anderson on the Uniform Commercial Code § 2-719:112 (3d ed. 2010) (stating

---

[11] Other courts take the contrary view. See 4B Anderson on the Uniform Commercial Code § 2-719:26 (3d ed. 2010) (citing cases).

A-0500-19

although "U.C.C. § 2-719 does not require that an exclusion of consequential damages be conspicuous, an exclusion of consequential damages is unconscionable when it is hidden in fine print, on the basis that 'the principle behind the concept of unconscionability is the prevention of oppression and unfair surprise'" (quoting Oldham's Farm Sausage, 633 S.W.2d at 182)). Alternatively, lack of conspicuousness may be a contributing factor, if not a decisive one, in determining section 719 unconscionability. See Gladden v. Cadillac Motor Car Div., 83 N.J. 320, 337-38 (1980) (Pashman, J., concurring).

One may argue that if a limitation of liability provision is unconscionable and therefore unenforceable because it is hidden in the document presented to the buyer, a limitation of liability provision is likewise unconscionable and unenforceable if it is hidden in an entirely different document that is incorporated by reference without any notice that it includes a damages limitation. That is the case here. At the very least, Mestek's limitation of liability provision is not conspicuous in the quotation; indeed, it is not present at all.

One court has held that a contract that incorporates by reference a limitation of damages clause must do so conspicuously. In Matador

A-0500-19

Production Co. v. Weatherford Artificial Lift Systems, Inc., 450 S.W.3d 580, 593-94 (Tex. Ct. App. 2014), the court rejected the defendant's argument that its website's terms and conditions passed muster because they were conspicuously presented within the website document, even if the print which referred the reader to the website was not. The court noted that the page "referring . . . to the terms and conditions on the website failed to indicate that substantial liability-limiting provisions were contained within the terms and conditions." Id. at 594. What's more, the type was small and located at the bottom of a page where it would not attract attention. Ibid.

Because we hold that the incorporation by reference here does not meet the test we articulated in Alpert, Goldberg, we do not decide if the incorporation also runs afoul of the UCC, especially since the parties did not expressly address the issue. But we note the issue because of its potential impact on remand, or in other cases.

Atlantic's remaining arguments lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). We add only that we discern no abuse of discretion in the trial court's denial of Atlantic's reconsideration motion. See Cummings v. Bahr, 295 N.J. Super. 374, 389 (App. Div. 1996) (applying abuse-of-discretion standard of review). Atlantic raised a legal issue regarding

27

the Statute of Frauds that it could have raised in its initial opposition to Mestek's partial summary judgment motion. See Medina v. Pitta, 442 N.J. Super. 1, 18 (App. Div. 2015) (stating that "a motion for reconsideration does not provide the litigant with an opportunity to raise new legal issues that were not presented to the court in the underlying motion"). Furthermore, "the factual predicates of [Atlantic's] new theory were available when [Atlantic] responded to [Mestek]'s motion for summary judgment." Cummings, 295 N.J. Super. at 384.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION