RENDERED: MAY 19, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0828-MR

ANTHONY BRADLEY, INDIVIDUALLY
AND AS ADMINISTRATOR OF THE
ESTATE OF MITZI WESTOVER                                    APPELLANTS


|  | APPEAL FROM JEFFERSON CIRCUIT COURT |
| v. | HONORABLE ANNIE O'CONNELL, JUDGE |
|  | ACTION NO. 18-CI-004436 |


LOUISVILLE MEGA CAVERN, LLC                                   APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, DIXON, AND ECKERLE, JUDGES.

ECKERLE, JUDGE: Anthony Bradley, Individually and as Administrator of the

Estate of Mitzi Westover (collectively, "the Estate") appeals from a judgment of

the Jefferson Circuit Court that confirmed a jury verdict in favor of Louisville

Mega Cavern, L.L.C. ("LMC"). The Estate argues that the trial court abused its

discretion in its evidentiary rulings and in its instructions to the jury. Finding no abuse of discretion, we affirm.

## I.      Facts and Procedural History

LMC operates an underground adventure park on the site of a former limestone mine in Louisville, Kentucky.[1] LMC operates several attractions on the site, including an underground, aerial adventure ropes course called Mega Quest. On August 17, 2017, Mitzi Westover, her husband Anthony Bradley, and her niece, Hanna Folk, purchased tickets for Mega Quest. Prior to taking part in any activity at LMC, they were required to read and execute a "Participant Agreement" ("the Agreement"). The Agreement describes the course as follows:

> The Mega Quest aerial challenge course is self-guided and includes short ziplines, sky bridges and walkways, (some inclined), located high in the cavern and some consisting of planking supported by steel cables and cable handrails. Mega Quest Participants are responsible for making all Equipment Transfers on their own after watching a training video, the careful viewing of which is extremely important and receiving instructions and training from tour guides using special equipment. The age limit for the Mega Quest challenge course is five years old. Participants must be able to reach a height of 50 inches with the palm of the hand with an outstretched arm while standing flatfooted on the floor, and weigh less than 310 pounds.

---

[1] The property comprising the former limestone mine is owned by Louisville Underground, L.L.C. The Estate named that entity as a party defendant in its complaint. However, it was dismissed by agreed order prior to trial and is not a party to this appeal.

In addition, the Agreement addressed medical and safety concerns, stating:

> The activities are designed for Participants of average mobility and strength who are in reasonably good health. Underlying medical problems including for example obesity, high blood pressure, cardiac and coronary artery disease, pulmonary problems, pregnancy, arthritis, tendonitis, other joint and muscular skeletal problems, or other medical, physical, psychological and psychiatric problems, may impair the safety and wellbeing of Participants on the course. All such conditions may increase the inherent risks of the experience and cause Participants to be a danger to themselves or others and Participants therefore must carefully consider those risks before choosing to participate, and they must fully inform the Provider or its staff of any issues, in writing, prior to using the Facilities. Provider reserves the right to exclude anyone from participating because of medical, safety, or other reasons it deems appropriate. Participant . . . : (1) represents that each Participant or Minor Participant is physically able to participate in the activities without being a danger to themselves or to others; (2) acknowledges that participation is purely voluntary, and done so in spite of the risks (3) is not pregnant, nor under the influence of alcohol, illegal drugs, or impairing legal drugs; (4) agrees to abide by all instructions provided by the Provider or the Provider's staff; (5) will not make any adjustments to zipline or challenge course equipment but, instead, will allow all adjustments to be made only by or with the assistance of Provider or Provider's staff; (6) will not intentionally flip over or invert while riding on the ziplines.

The Agreement goes on to identify "inherent" risks in the Mega Cavern:

> Serious injuries can occur in zipline courses, challenge course tours, and bike park activities including the risk of injury or death. Risks include among others the

-3-

following: falls, contact with other participants and fixed or falling objects, and moving about or being transported over the sometimes uneven terrain and grounds on which the activities are initiated and conducted[.] . . . The physical risks range from small scrapes and bruises to bites and stings, broken bones, sprains, neurological damage, and in extraordinary cases, even death. These risks, and others, are inherent to the activities that is, they cannot be eliminated without changing the essential nature, educational and other values of the experience. In all cases, these inherent risks, and other risks which may not be inherent, whether or not described above must be accepted by those who choose to participate.

Following these disclosures, the Agreement states that the participant understands the nature of the activities and voluntarily assumes the risks involved. This provision also states that LMC "has no duty to protect against the risks of illness, injury and death associated with these activities inherent and otherwise, and whether or not described above, including those which may result from negligent acts or omissions of other participants or staff."

The Agreement also included a "Release and Indemnity" provision, stating that each participant will release, hold harmless, and indemnify LMC for any injuries caused by the activity, including claims of negligence and gross negligence. This section further states that the participant agrees as follows:

not to sue [Provider] for any liability for causes of action, claims and demands of any kind and nature whatsoever, including personal injury and death, products and premises liability and otherwise, that may arise out of or relate in any way to my . . . enrollment or participation in Provider's programs. The claims hereby indemnified

against include, among others, claims of participants and members of my . . . family, arising out of losses caused by, or suffered by me . . . . The agreements of release and indemnity include claims of negligence of a Released Party including without limitation claims of gross negligence, but not claims of willful injury.

The Agreement concluded with bolded language stating:

WARNING
Under Kentucky law, there is no liability for an injury to or death of a participant in an agritourism activity conducted at this agritourism location if injury or death results exclusively from the inherent risks of the agritourism activity and in the absence of negligence. You are assuming the risk of participating in this agritourism activity. KRS[2] 247.800-247.8010.

As required, Westover, Bradley, and Folk electronically signed the Agreement. They then checked in at the front desk and were provided with equipment for the course. LMC provided a safety briefing and training on the course and use of the equipment. Shortly thereafter, the party began the Mega Quest course. Westover started an element that consisted of two horizontal ladders suspended from overhead wire ropes. Westover fell on the first ladder and was assisted by an LMC employee.

She fell again on the second ladder and was unable to get back on the ladder. The LMC employee called for a rescue via a lower-line kit. Westover was suspended on the harness for between five to eight minutes. Westover was

---

[2] Kentucky Revised Statutes.

responsive for most of this time.  But as she was being lowered, Westover lost consciousness and became unresponsive.   LMC called 911, which did not arrive on the scene for another nine minutes.  Westover was transported to the hospital, where she died on August 22, 2017.

On July 31, 2018, Bradley, individually and as administrator of Westover's Estate, brought this action against LMC asserting claims of personal injury and wrongful death.  Bradley separately asserted a claim for loss of spousal consortium.  LMC moved for summary judgment based on the "Release and Indemnity" provisions in the Agreement.  LMC also argued that it was entitled to agritourism immunity under KRS 247.809.  The Trial Court denied the motion for summary judgment, concluding that the pre-injury release was not enforceable. The Court also determined that LMC was not entitled to immunity under KRS 247.809.

Prior to trial, the Estate moved to exclude any reference to the Agreement, arguing that it was not relevant based on the Court's finding it was unenforceable.  LMC responded that the Agreement was relevant to show she had been informed of the risks of the activity, and that she had agreed she was able to participate without being a danger to herself or others.  The Trial Court agreed with LMC and allowed introduction of the Agreement.

At trial, the Estate presented evidence that Westover's death was caused by suspension trauma resulting from her extended time hanging unsupported on the harness. The Estate argued that this suspension trauma was caused by LMC's failure to exercise ordinary care in the operation of the Mega Quest course and LMC's failure to properly train its staff to respond to emergencies. In response, LMC argued that Westover's death was caused by her pre-existing health conditions and her own failure to exercise ordinary care. Following the close of proof, the jury found that the Estate failed to prove that LMC failed to exercise ordinary care in the operation of the Mega Quest course and that such failure was a substantial factor in causing Westover's death.

The Estate filed a motion for a new trial pursuant to CR[3] 59.01. The Trial Court denied the motion and entered a judgment dismissing based upon the jury's verdict. The Estate now appeals. Additional facts will be set forth below as necessary.

## II.    Standard of Review

A trial court is vested with broad discretion in granting or denying a new trial, and its decision will not be reversed unless it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v.*

---

[3] Kentucky Rules of Civil Procedure.

*English*, 993 S.W.2d 941, 945 (Ky. 1999). Since the Trial Court had the direct opportunity to consider the evidence and the conduct of the parties, any doubts must be resolved in favor of the Trial Court. *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 73 (Ky. 2010).

In this case, the Estate first argues that it was entitled to a new trial because the Trial Court erroneously admitted certain evidence. We review the Trial Court's evidentiary rulings for abuse of discretion. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* at 581. More specifically, a court abuses the discretion afforded it when "(1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision . . . cannot be located within the range of permissible decisions." *Miller v. Eldridge*, 146 S.W.3d 909, 915 n.11 (Ky. 2004) (cleaned up).

## III. Admission of the Agreement into Evidence

The Estate first raises several issues relating to the Trial Court's admission of the Agreement into evidence. Based on the Trial Court's finding that the Release and agritourism-immunity provisions in the Agreement were unenforceable, the Estate filed a motion *in limine* to exclude the Agreement or any

reference to it at trial. The Estate argued that the Release provisions were irrelevant and likely to confuse the jury with matters not at issue.

In response, LMC noted that the Agreement set out the risks of the activity, including to persons with health issues. By signing the Agreement, Westover stated that she was aware of the risks, she was physically capable of performing the Mega Quest course, and that she was not under the influence of any illegal or legal intoxicating drugs. LMC argued that the disclosures in the Agreement were relevant to show that Westover failed to exercise ordinary care in undertaking the Mega Quest course. LMC further argued that the Agreement was relevant to show that Westover failed to inform LMC of her medical conditions or her medications.

The Trial Court concluded that, even though the Release and agritourism-immunity provisions of the Agreement were unenforceable, the Agreement itself was still relevant to the disputed issues of negligence. The Trial Court redacted the bolded agritourism warning at the end of the Agreement, except for the line, "You are assuming the risk of participating in this . . . activity."

Subsequently, the Estate requested a limiting instruction advising the jury that the Release was unenforceable, but "you may consider the 'Participant Agreement' for the purpose of determining whether Mitzi Westover was aware of

the risks associated with the 'Mega Quest' ropes course." The Trial Court declined to provide this instruction to the jury.

The Estate extensively argues that the Release provisions in the Agreement were not enforceable. However, the Trial Court agreed, finding that the release was not enforceable as a waiver or release of LMC's liability for negligence. LMC does not appeal this ruling. Rather, the question on appeal is whether the Agreement was otherwise relevant to the factual matters in dispute; the question is whether the evidence was relevant, or if the prejudicial effect of the evidence substantially outweighed its probative value.

Under KRE[4] 401, relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under KRE 402, "[a]ll relevant evidence is admissible" unless otherwise excluded by the law or rules of evidence. "Evidence which is not relevant is not admissible." KRE 402. Relevance is established by any showing of probativeness, however slight. *Springer v. Commonwealth*, 998 S.W.2d 439, 449 (Ky. 1999). However, under KRE 403, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of undue

---

[4] Kentucky Rules of Evidence.

-10-

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

The Estate cites two out-of-state cases holding that it is prejudicial error to admit an unenforceable liability-limiting agreement. *Matador Production Co. v. Weatherford Artificial Lift Systems, Inc.*, 450 S.W.3d 580, 594 (Tex. App. 2014); and *Blue Valley Co-op v. National Farmers Organization*, 600 N.W.2d 786, 793-96 (Neb. 1999), *overruled on other grounds by Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019). However, in both cases there were no claims that the agreements were relevant for any reason except as a waiver of liability. *Matador*, 450 S.W.3d at 595; *Blue Valley*, 600 N.W.2d at 794. In this case, the Trial Court expressly found that the Agreement was relevant to the disputed issues of negligence. Those issues included whether LMC notified Westover of the inherent risks of the activity, as well as any risks that the activity may have posed to individuals with limited mobility or medical conditions.

LMC further argued that the Agreement was relevant to determine the adequacy of its warnings. The Trial Court also concluded that the Agreement was a party admission by Westover under KRE 801A(b). By signing the Agreement, the Trial Court found that Westover manifested her assent to and adoption of the disclosures in the Agreement, as well as her own representations that she was physically capable of performing the activity. Obviously, the Estate raised other

disputed issues of negligence, including whether LMC staff was adequately trained and had access to proper equipment in the event of an emergency.

While the Agreement may not have been admissible to prove that Westover waived or released LMC from liability for its own negligence, it was otherwise relevant to show whether Westover was informed of the risks of the Mega Quest course, as well as whether she properly informed LMC of any physical or medical conditions and medications that may have affected her safety on the course. Because these issues were relevant to the disputed issues of negligence, we conclude that the Trial Court did not abuse its discretion by allowing LMC to introduce the Agreement into evidence.

The more significant question is whether the Agreement's probative value was substantially outweighed by its prejudicial effect. The Estate contends that the Release and Indemnity language was likely to confuse the jury about the ultimate issue of liability. Specifically, the Estate argues that the language may have misled the jury into believing that Westover had waived her right to claim negligence by LMC.

The Trial Court must make three basic inquiries when making a determination under KRE 403: (1) assessment of the probative worth of the evidence whose exclusion is sought; (2) consideration of the probable impact of specified, undesirable consequences likely to flow from its admission (*i.e.*, "undue

prejudice, confusion of the issues, or misleading the jury, . . . undue delay, or needless presentation of cumulative evidence"); and (3) a determination of whether the harmful effects from admission exceeds the probative worth of evidence. *Webb v. Commonwealth*, 387 S.W.3d 319, 326 (Ky. 2012) (citing *Partin v. Commonwealth*, 918 S.W.2d 219, 222 (Ky. 1996), *overruled on other grounds by Chestnut v. Commonwealth*, 250 S.W.3d 288 (Ky. 2008)). The task of weighing the probative value and undue prejudice of proffered evidence is inherently factual and, therefore, within the discretion of the Trial Court. *Ross v. Commonwealth*, 455 S.W.3d 899, 910 (Ky. 2015).

Here, the Estate asserts the jury was likely to be confused or misled by the Release and Indemnity language in the Agreement. But the Estate does not point to any testimony, evidence, or argument that emphasized the language or suggested that it was controlling as to LMC's liability. Furthermore, the Trial Court redacted the bolded language excluding liability for injury or death arising from an agritourism activity, except for the assumption-of-risk language, but the Trial Court did not redact the Release and Indemnity provision at the Estate's request. Under the circumstances, the Estate has not shown the prejudicial effect of the Agreement substantially outweighed its probative value.

Along similar lines, the Estate requested an instruction advising the jury that the Agreement's Release and Indemnity language was unenforceable.

The proposed instruction stated that "you may not determine that [LMC] is immune from lawsuit. However, you may consider the 'Participant Agreement' for the purpose of determining whether Mitzi Westover was aware of the risks associated with participation in the 'Mega Quest' ropes course." The Estate takes the position that it was entitled to this limiting instruction under KRE 105(a), which provides as follows:

> When evidence which is admissible as to one (1) party or for one (1) purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and admonish the jury accordingly. In the absence of such a request, the admission of the evidence by the trial judge without limitation shall not be a ground for complaint on appeal, except under the palpable error rule.

As discussed above, the Agreement was relevant and admissible as it related to the disputed issues of negligence and as a party admission. But the Agreement was not admissible for LMC to avoid liability under its waiver and release provisions. Indeed, the construction and enforceability of a written instrument are matters of law for the Trial Court to decide, not the jury. *See Morganfield National Bank v. Damien Elder & Sons*, 836 S.W.2d 893 (Ky. 1992), and *Cinelli v. Ward*, 997 S.W.2d 474, 476 (Ky. App. 1998). The Estate points out that KRE 105 required the Trial Court to give the instruction "upon request." Consequently, the Estate argues that the Trial Court's failure to give the instruction constitutes reversible error.

In denying the request, the Trial Court took the position that KRE 105 required the Estate to move for an admonition to the jury at the time the Agreement was introduced, and it was not a proper matter for jury instructions. The Kentucky Supreme Court addressed this issue in *St. Clair v. Commonwealth*, 140 S.W.3d 510 (Ky. 2004). In that case, a defendant waited until the close of evidence to request a limiting instruction as to the appropriate purpose of certain evidence pursuant to KRE 105. The Court held that

> [a]lthough the substantive distinction between admonitions and instructions is not always clear or closely hewn to, we interpret the first word of KRE 105(a), *i.e.*, "when," to mean that *the request* for a "limited purpose" admonition must be made at the time *that the evidence in question is admitted* and no later than after the direct examination at which the evidence is introduced.

*Id.* at 559 (emphasis in original) (internal quotation marks and citations omitted). More recently, our Supreme Court reiterated this point, holding that, "[a]lthough it is within the trial court's discretion to determine when the admonition should be given, it must be requested 'no later than after the direct examination' where the evidence is introduced." *Posey v. Commonwealth*, 595 S.W.3d 81, 87 (Ky. 2019) (quoting *St. Clair*, 140 S.W.3d at 559). Because the Estate failed to request an admonition at the time the Agreement was introduced, we may only review the Trial Court's denial of an instruction for palpable error.

In the civil context, CR 61.02 defines "palpable error" as an error that affects the substantial rights of a party. An appellate court may review an error and grant appropriate relief, even though the issue is insufficiently raised or preserved for review, "upon a determination that manifest injustice has resulted from the error." "Manifest injustice" means that "if, upon consideration of the whole case, a substantial possibility does not exist that the result would have been different, the error will be deemed nonprejudicial." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006) (interpreting language in RCr[5] 10.26, which has been construed "identically" to CR 61.02. *See Nami Resources Company, L.L.C. v. Asher Land and Mineral, Ltd.*, 554 S.W.3d 323, 338 (Ky. 2018)) (citing *Graves v. Commonwealth*, 17 S.W.3d 858, 864 (Ky. 2000)).

We agree with the Estate that the introduction of the Release and Indemnity portions of the Agreement posed a risk of confusing the jury. Without a limiting instruction, the jury had no guidance from the Court to determine how that language was to be read. The jury may have also been led to believe that it was to consider the legal issue regarding the enforceability of the Agreement. Under these circumstances, we believe that the Trial Court would have been justified in

---

[5] Kentucky Rules of Criminal Procedure.

-16-

giving the Estate's proposed instruction even though the issue was not raised by a contemporaneous objection.

Having said this, the mere possibility of prejudice is not enough to show manifest injustice. The Estate must show a likelihood – "a reasonable possibility" – that, but for the failure to give the instruction, a different result would have occurred. *Parker v. Commonwealth*, 482 S.W.3d 394, 407-08 (Ky. 2016). "Implicit in the concept of palpable error correction is that the error is so obvious that the trial court was remiss in failing to act upon it *sua sponte*." *Nami Res.*, 554 S.W.3d at 338 (Ky. 2018) (quoting *Lamb v. Commonwealth*, 510 S.W.3d 316, 325 (Ky. 2017)).

Prior to trial, the Estate sought to exclude introduction of the Agreement as irrelevant. The parties extensively litigated this matter, resulting in the Trial Court's ruling that the Release portions of the Agreement were unenforceable, but that the Agreement was admissible for other purposes. Prior to introduction of the Agreement, the parties also discussed whether portions of the Agreement should be redacted. Based on these discussions, the Trial Court redacted a significant portion of the emphasized language. The Trial Court may well have concluded that the Estate's decision not to request an admonition was a strategic choice to avoid emphasizing the remaining language in the Agreement.

At trial, LMC emphasized the language in the Agreement describing the risks of the activity and addressing the health and safety concerns. But as noted above, LMC neither argued that the Agreement was controlling as to liability, nor did it suggest that Westover waived her right to recover for any negligence on its part. Therefore, we must conclude that the Estate failed to establish that the Trial Court's declination to give the limiting instruction amounted to palpable error.

## IV.    Instructions on LMC's duties

The Estate also argues that the Trial Court erred by failing to give complete jury instructions on the issue of LMC's duties. The Trial Court's instruction advised the jury that LMC had the following duty:

> to exercise ordinary care for the safety of its patrons. "Ordinary Care," as applied to [LMC], means such care as you would expect an ordinarily prudent company engage[d] in the same type of business to exercise under similar circumstances.

The Estate's proposed instruction included the "ordinary care" language, but also stated LMC's general duty included the following specific duties:

> to make the condition of the "Mega Quest" ropes course reasonably safe; and
>
> > (1) to discover unreasonable risks of harm associated with the "Mega Quest" ropes course; and either

-18-

> (a) take active steps to make the risks safe; or
>
> (b) give adequate warning of those risks.

The Estate's proposed instruction further defined "unreasonable risk" as:

> one that is recognized by a reasonable company in similar circumstances as one that should be avoided or minimized, or one that is in fact recognized by [LMC]. Even if you find that [LMC] adequately warned of the risks associated with participation in the "Mega Quest" ropes course, you may find that [LMC] failed to exercise ordinary care by failing to adopt further precautions against those risks, if it was foreseeable that, despite the warning, some risk of harm remained.

The Estate argues that it was entitled to instructions on the specific duties supporting its cause of action against LMC. A party plaintiff is entitled to have its theory of the case submitted to the jury if there is any evidence to sustain it. *Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 250 (Ky. 1995), *overruled on other grounds by Martin v. Ohio Cnty. Hosp. Corp.*, 295 S.W.3d 104 (Ky. 2009). However, Kentucky law generally requires the use of "bare bones" instructions. *Olfice, Inc. v. Wilkey*, 173 S.W.3d 226, 229 (Ky. 2005) (citing *Lumpkins v. City of Louisville*, 157 S.W.3d 601, 605 (Ky. 2005)). "Bare bones" instructions are proper if they correctly advise the jury about "what [it] must believe from the evidence in order to return a verdict in favor of the party who bears the burden of proof" on

-19-

that issue. *Meyers v. Chapman Printing Co., Inc.*, 840 S.W.2d 814, 824 (Ky. 1992). The question on appeal is whether the allegedly erroneous instruction misstated the law. *Id.* at 823.

In *Smith v. Smith*, 563 S.W.3d 14, 18 (Ky. 2018), our Supreme Court held that a single, "ordinary care" jury instruction does not properly instruct the jury when liability is based upon land classifications or the possessor's duty based upon those classifications. *Id*. But in that case, there was a factual issue as to whether the plaintiff was a licensee, a public invitee, or a business invitee. *Id.* at 17-18. Thus, the separate instruction was necessary for the jury to determine the applicable standard of ordinary care.

In this case, the Estate argued that LMC's duties of ordinary care included duties to make the premises reasonably safe, to discover unreasonable risks of harm associated with the ropes course, and to take active steps to make those risks safe or to give adequate warning of those risks. *Shelton v. Kentucky Easter Seals Soc., Inc.*, 413 S.W.3d 901, 913-14 (Ky. 2013). But as noted in *Shelton*, the issue of duty is a purely legal one, while the standard of care is a factual question. *Id.* at 914. Here, there was no question that Westover was a business invitee.

Although the Estate asserts that LMC breached its duties to discover unreasonable risks of harm associated with the ropes course, its claims at trial were

that LMC failed to use ordinary care in the operation of the ropes course and failed to give Westover adequate warning of the potential risks arising from negligence by either LMC or Westover. Any additional duties could be further explained during closing argument. *Olfice, Inc.*, 173 S.W.3d at 230. Since these duties are adequately covered by the duty of ordinary care, the Trial Court did not abuse its discretion by denying the Estate's proffered instruction.

## V.     Admission of Evidence of Hydrocodone in Westover's urine

The Estate additionally argues that the Trial Court abused its discretion by admitting evidence of hydrocodone in Westover's urine. Prior to trial, the Estate filed a motion *in limine* to exclude a toxicology report showing that Westover had oxycodone and oxymorphone in her blood and hydrocodone in her urine when she was admitted to the hospital. Based on the toxicology report, LMC's expert witness, Dr. William Smock, was prepared to testify that Westover had levels of oxycodone and hydrocodone in her system, but he was not able to definitively state that these levels caused any impairment or intoxication. Dr. Smock stated that Westover had a prescription for oxycodone, and that oxymorphone is a metabolite of oxycodone. But he could not locate her prescription for hydrocodone. LMC's other medical expert, Dr. Greg Davis, provided similar testimony.

The Estate argues that the evidence and testimony should be excluded because neither physician could state with any reasonable certainty that Westover was impaired or intoxicated when she undertook the Mega Quest course. The Estate also contends that LMC sought to use the testimony as improper character evidence, branding Westover as an illicit drug user. But, as previously noted, LMC responded that the evidence was relevant because Westover represented that she was not under the influence of any impairing drugs. The Trial Court agreed with LMC and denied the Estate's motion.

Generally, an expert's opinion must be couched in terms of probability or reasonable certainty, and opinions which are expressed using language such as "possibility" may be properly excluded as speculative. *Combs v. Stortz*, 276 S.W.3d 282, 296 (Ky. App. 2009) (citing *Schulz v. Celotex Corp.*, 942 F.2d 204, 208-09 (3d Cir. 1991)). But unlike in *Calhoun v. CSX Transp., Inc.*, No. 2007-CA-001651-MR, 2009 WL 152970, at *13 (Ky. App. Jan. 23, 2009), *aff'd in part, rev'd in part*, 331 S.W.3d 236 (Ky. 2011), Drs. Smock and Davis were not testifying that Westover's use of opiates caused her to be impaired or contributed to her injury. They merely testified as to the presence of those substances in her blood and urine at the time of her death.

While KRE 404(b) protects against the introduction of extrinsic act evidence when the evidence is offered solely to prove character, it allows such

evidence to be introduced for a proper purpose.  *Burton v. Commonwealth*, 300 S.W.3d 126, 136 (Ky. 2009).  This evidence was relevant to show that Westover failed to disclose her use of these substances when she executed the Agreement. Furthermore, the testimony of Drs. Smock and Davis was subject to vigorous cross-examination, during which both admitted that there was no evidence that Westover was impaired.

The Estate maintains that LMC sought to portray Westover as an illicit user of hydrocodone.  However, Dr. Davis conceded that Westover may have had a prescription for hydrocodone even though the prescription could not be located at the time of trial.  The Estate also presented evidence that trace amounts of hydrocodone may have been found in Westover's prescription for oxycodone. In addition, the Estate does not point to any evidence, testimony, or argument at trial suggesting that Westover should be denied relief because of her use of these drugs.  Because the evidence was relevant and not unduly prejudicial, we cannot find that the Trial Court abused its discretion by allowing evidence and testimony concerning the presence of hydrocodone in Westover's urine.

## VI.  Limitation on Cross-Examination

The Estate also argues that the Trial Court abused its discretion by limiting its ability to cross-examine LMC witnesses regarding standards and literature published by the Occupational Health and Safety Administration

("OSHA"). At trial, LMC's owner, Jim Lowry, testified that LMC was not required to train its staff in first aid or CPR. LMC's former safety manager, Kimberly Coleman, also testified that it was her understanding that LMC was not required to train its employees to the standards set out by OSHA and the Association for Challenge Course Technology ("ACCT"). When the Estate sought to cross-examine these witnesses about these standards, LMC responded that the OSHA standards were only applicable to employees and not participants in the activity. The Trial Court agreed and precluded the Estate from cross-examining the witness on this matter.

The Estate contends that the OSHA standards and literature were relevant to determine the standard of care expected of an operator of a ropes course and zip line such as LMC. But while industry standards or manuals can inform the standard of care that will satisfy a duty, neither establishes the duty itself. *Spencer v. Arnold*, No. 2018-CA-000479-MR, 2020 WL 4500588, at *7 (Ky. App. Jul. 24, 2020) (citing *Carman v. Dunaway Timber Co., Inc.*, 949 S.W.2d 569, 571 (Ky. 1997)). As the Trial Court noted, the OSHA regulations and literature specifically referred to the duties owed to employees, not participants. Furthermore, Kentucky had not adopted the ACCT standards at the time of Westover's injuries. Given the limited relevance of these materials, the Trial Court did not abuse its discretion by restricting the Estate's cross-examination on these matters.

-24-

**VII. Exclusion of portions of deposition testimony by LMC's CR 30.02(b) representative**

Finally, LMC designated General Manager Jeremiah Heath as its corporate representative pursuant to CR 30.02(6).  Following Heath's testimony at trial, the Estate sought to read two portions of Heath's deposition into the record.  Specifically, the Estate wanted to introduce deposition testimony in which Heath stated that he had informed LMC employees that they were not allowed to perform CPR.  LMC objected, noting that the Estate had an opportunity to cross-examine Heath with his deposition testimony.  The Trial Court agreed and sustained LMC's objection.

The Estate notes that CR 32.01(b) permits the deposition of a corporate representative to be "used by an adverse party for any purpose."  The Estate further notes that the rule permits testimony to be read to the jury even though the designee is available to testify in person.  *Lambert v. Franklin Real Est. Co.*, 37 S.W.3d 770, 779 (Ky. App. 2000)(citing Kurt A. Philipps, Jr., 6 *Kentucky Practice*, CR 32.01 (5th ed. 1995)).  However, that language is limited to use of testimony "admissible under the rules of evidence as though the witness were then present and testifying."  *Hashmi v. Kelly*, 379 S.W.3d 108, 112 (Ky. 2012) (quoting CR 32.01).

While the rule clearly permitted the Estate to cross-examine Heath with his prior deposition testimony, we agree with the Trial Court that his

deposition testimony was not separately admissible after he testified. Use of the deposition in this manner would have been substantially prejudicial because LMC would have lacked the opportunity to rebut or explain the testimony without recalling Heath. *See Graves by & Through Graves v. Jones*, No. 2019-CA-0880-MR, 2021 WL 1431851, at *8 (Ky. App. Apr. 16, 2021). Furthermore, the Trial Court noted that it had sustained several of LMC's objections during those portions of Heath's deposition. Those sustained objections would have further limited the admissibility of those portions of the deposition. Given these considerations, we cannot find that the Trial Court abused its discretion by denying the Estate's untimely request to read these portions of Heath's deposition testimony to the jury.

## VIII. Conclusion

We conclude that the Trial Court's evidentiary rulings and jury instructions did not amount to an abuse of discretion. Although the Agreement was not relevant to prove that Westover or her Estate waived any claim to liability based on LMC's negligence, it was relevant and admissible as to the other disputed issues of negligence. Furthermore, the prejudicial effect of the Agreement did not substantially outweigh its probative value on these matters. The Release and Indemnity language in the Agreement was potentially misleading. However, the Estate did not make a contemporaneous request for an admonition. Therefore, the

Trial Court's failure to grant a limiting instruction did not amount to palpable error.

The Trial Court's instructions accurately stated the applicable law and correctly advised the jury about what it needed to believe from the evidence to return a verdict in favor of the Estate. We also conclude that the medical evidence concerning the presence of hydrocodone in Westover's urine was relevant and not unfairly prejudicial. Finally, the Trial Court did not abuse its discretion by limiting the Estate's cross-examination on OSHA standards or by declining to read Heath's deposition into the record after he had testified. Consequently, we find no basis to disturb the jury's verdict.

Accordingly, we affirm the judgment of the Jefferson Circuit Court.

ALL CONCUR.

| BRIEF FOR APPELLANTS: | BRIEF FOR APPELLEE: |
| --- | --- |
| Brenton D. Stanley | Maxwell D. Smith |
| Jason Swinney | Ashley K. Brown |
| Louisville, Kentucky | Betsy R. Catron |
| | William J. Barker II |
| Molly B. Stanley | Lexington, Kentucky |
| Louisville, Kentucky | |
| | |
| Kevin C. Burke | |
| Jamie K. Neal | |
| Louisville, Kentucky | |